**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**WESTERN WIREBOUND BOX CO., Respondent.**

**No. 20046.**

United States Court of Appeals Ninth Circuit.

Jan. 19, 1966.

Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Warren M. Davison, Richard S. Rodin, Attorneys, N. L. R. B., Washington, D. C., for petitioner.

McColloch, Dezendorf & Spears, William F. Lubersky, James H. Clarke, Portland, Or., for respondent.

Before HAMLEY, JERTBERG and MERRILL, Circuit Judges.

HAMLEY, Circuit Judge:

The National Labor Relations Board seeks enforcement of its order directing Western Wirebound Box Co. to cease and desist from certain asserted unfair labor practices and to take specified corrective action.

The principal unfair labor practice, as found by the Board, was the refusal of the company to bargain in good faith with the representative of its employees, International Woodworkers of America, Local Union 3–3 AFL–CIO. Specifically, the failure to bargain consisted of the company's refusal to produce certain records tending to substantiate its position during the negotiations for a new contract. This was held to be a violation of section 8(a) (5) and (1) of the National Labor Relations Act (Act), 61 Stat. 140 (1947), as amended, 29 U.S.C. § 158(a) (1964).

The relevant facts, stated below, are drawn from the trial examiner's findings of fact.[1] In 1961, a contract was reached between the union and the company providing for an hourly wage increase of 7½ cents. In March, 1962, in anticipation of the expiration of the contract on June 1 of that year, the company wrote to the union stating that it was continuing to suffer from the competition of other manufacturers of paper containers and Southern manufacturers of wirebound containers. In order to maintain a competitive position, the company advised, it was necessary to ask its employees to accept a wage reduction of eight cents an hour. About the same time that this letter was written, the union wrote that it desired to negotiate a wage increase of ten cents an hour.

Beginning on May 1, 1962, a number of meetings took place between the parties. At the third meeting, on May 21, 1962, Walter Green, president of the company, said that he was willing to give a wage increase, or perhaps a smaller wage cut, to those in the ender classification, but insisted upon a wage cut of eight cents for the others. In response to a question by a union representative, Green answered that he was not saying that the company was unable to pay the wage increase demanded.

At the opening of the fourth meeting, held on May 28, 1962, Green announced that he was receding from the eight-cent figure and was now offering to settle for a four-cent wage cut with an increase or lesser cut for the enders. Green said that the cut was necessary because of price cutting indulged in by competition. Wallace Murray, a representative of the union, then said that the union would like to have figures for the past two years relating to productivity, labor and material costs, and price changes.

Green said that such information was not available because a new accounting system was in the process of installation. Green also said that he would not consent to the employment, by the union, of an independent accountant to look at the company's books. However, he offered to make his accountant available to the un-

---

[1] In their respective briefs filed in this court, each party has referred to the testimony favorable to it, as reviewed in the trial examiner's decision, as if such testimony constituted the established facts of the case. The testimony, however, was in dispute, and we have made an effort to refer only to those portions of the trial examiner's decision which review undisputed testimony, or which appear to represent findings of fact.

ion for consultation. The union representative said that this would not be satisfactory.

During the first two meetings Green said, in effect, that a failure to bring about a cut in wages would cause the business to operate at a loss and might threaten its existence. The company, however, soon abandoned these arguments by offering to continue the wages then in effect and to grant a small increase to the enders, as described below. In response to later union inquiries, Green replied that the company was not "pleading inability to pay." Beginning with the later meetings, the company's entire position was based on the assertion that price competition was vigorous.

Still another meeting took place on June 6, 1962. Green there stated that the company was withdrawing from its position that it must have a wage cut. He also offered to increase the wage of the enders by 2½ cents an hour. Murray again asked for productivity and production cost figures, but Green said that they were not available.

That afternoon all parties met with a conciliator of the United States Department of Labor; the meeting was adjourned without an agreement being reached. The negotiators next met on June 11, 1962, in the presence of the conciliator. Nothing was accomplished. A strike was called that morning because the company failed to supply to the union the data requested. The strike was still in effect at the time of the hearing before the trial examiner.

At no time did any spokesman for the union ask for more than figures relating to productivity and unit cost. Despite what Green told union negotiators, the company was not by reason of accounting problems disabled from providing the union with comparative figures for 1961 and 1962, showing gross production, gross labor cost, and gross value of the production.

Relying on N. L. R. B. v. Truitt Manufacturing Co., 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027, the trial examiner held that, under the indicated circumstances, the company's failure to supply the requested data in support of its contention that it would be competitively disadvantaged by granting wage increases for 1962, constituted a failure to bargain in good faith.

Challenging this finding and conclusion the company argues that a claim of competitive disadvantage, such as was made here, is not within the principle announced in the *Truitt* case.

In *Truitt*, the company would not accede to the union's wage demands because " * * * it could not afford to pay such an increase, it was undercapitalized, had never paid dividends, and * * * an increase of more than 2½ cents per hour would put it out of business." The union asked the company to produce some evidence substantiating these statements, requesting permission to have a certified public accountant examine the company's books, financial data and the like. This request being denied, the union asked that the company submit "full and complete information with respect to its financial standing and profits * * *." The company refused all requests, stating that the requested information was not pertinent to the negotiations and the union had no legal right to it.

In upholding the Board order in *Truitt*, the Supreme Court said:

"Good-faith bargaining necessarily requires that claims made by either bargainer should be honest claims. This is true about an asserted inability to pay an increase in wages. If such an argument is important enough to present in the give and take of bargaining, it is important enough to require some sort of proof of its accuracy." 351 U.S. 152–153, 76 S.Ct. 755–756.

The quoted language indicates to us that the principle announced in *Truitt* is not confined to cases where the employer's claim is that he is unable to pay the wages demanded by the union. That sort of claim, rather, was held to be covered by the stated broad principles that good-faith bargaining necessarily

requires that claims made by either bargainer should be honest claims, and that if an argument is important enough to present during bargaining sessions, it is important enough to require substantiation.

■ We see no reason why, under the same rationale, an employer who insistently asserts that competitive disadvantage precludes him from acquiescing in a union wage demand, does not have a like duty to come forward, on request, with some substantiation. In both cases, the give-and-take of collective bargaining is hampered and rendered ineffectual when an employer mechanically repeats his claim but makes no effort to produce substantiating data. In one case as well as the other this sort of conduct runs counter to section 204(a) (1) of the Act, 61 Stat. 154 (1947), 29 U.S.C. § 174(a) (1) (1964), which admonishes both employers and employees to "exert every reasonable effort to make and maintain agreements concerning rates of pay, hours, and working conditions."

It is true that in Taylor Foundry Company, 141 NLRB 765, 767, enforced per curiam, N. L. R. B. v. Taylor, 5 Cir., 338 F.2d 1003, and Metlox Mfg. Co., 153 NLRB (No. 124), the view is expressed that the principle announced in *Truitt* applies only where the employer claims inability to pay. However, the Board has a right to change its view as long as its new position is not erroneous. As previously indicated, we are of the opinion that the Board did not err here in giving a broader scope to the *Truitt* rule.

The company contends that, even assuming that *Truitt* is applicable, the trial examiner and the Board failed to make a finding of subjective bad faith, as required by that decision. In this connection our attention is called to this language in *Truitt*:

"* * * a refusal to attempt to substantiate a claim of inability to pay increased wages may support a finding of a failure to bargain in good faith. * * * We do not hold, however, that in every case in which economic inability is raised as an argument against increased wages it automatically follows that the employees are entitled to substantiating evidence. Each case must turn upon its particular facts. The inquiry must always be whether or not under the circumstances of the particular case the statutory obligation to bargain in good faith has been met." (Footnote omitted.) 351 U.S. at 153–154, 76 S.Ct. at 756.

The decision of the trial examiner contains a lengthy recital of the evidence and definite findings on the several questions of fact. While these findings do not contain a specific statement to the effect that the company was guilty of subjective bad faith, we think that this is implied in the findings read as a whole. The trial examiner specifically found that, by refusing to produce records "in the circumstances described," the company refused to bargain with the union. This demonstrates that the examiner did not regard *Truitt* as laying down a *per se* rule to be applied automatically, but predicated his decision on the particular facts of this case. The Board adopted the findings and conclusions of the examiner.

■ Insofar as the findings reveal, the employer's claim was that the competition it was encountering made it imperative that costs be minimized. The company asserts that its duty to substantiate this claim was fulfilled when it offered to make available wage data of its competitors and other information about competing products.

In support of this assertion, the employer refers us to the testimony of Walter W. Green, president of the company, and to two exhibits. The facts testified to by Green on this point have no counterpart in the trial examiner's findings, and therefore do not constitute the established facts of the case. The company has not contended that the trial examiner's findings are inaccurate or incom-

plete in any respect.[2] The exhibits to which our attention is called do not bear upon this factual issue.

While the information offered with respect to competitors' wages and products may have been relevant, it was less than adequate substantiation. We are therefore of the view that the company is not now in a position to assert fulfillment of its duty to substantiate its claim by reason of an asserted willingness to produce this type of data.

■■ The failure of the company to produce data supporting its claim constituted failure of its duty, under *Truitt*, unless: (1) no request was made for such data; or (2) such data could not be supplied.

The trial examiner found that at no time did the union ask for more than figures relating to productivity and unit cost. And, although detailed unit cost figures were not readily available, the examiner held that:

> " * * * Green could hardly have been mystified in the matter. He must have understood that the Union was seeking some sort of showing that the Respondent was or was not producing more (that is products of greater gross value) in 1962 than it had with a larger work force in 1961. I find contrary to the contention of the Respondent that it could have provided the Union with figures at least approximating those requested."

We think this is a supportable finding and reasonable conclusion having in view all of the facts of the case. The duty to substantiate a claim upon request, established by *Truitt*, is not to be defeated because the union fails to ask for the precise kind of information which is relevant to the claim, or because the company although capable of supplying relevant information, is unable to supply other relevant or irrelevant data specifically requested by the union. The hallmark of lawfully adequate negotiations for a

collective bargaining agreement is good faith, and good faith contemplates that both negotiating parties will do what is reasonably possible to reach agreement. Negotiations are to be at arm's length but this does not contemplate erection of artificial barriers and resort to patent technicalities to obfuscate the proceedings.

The other contentions advanced by the company in opposition to enforcement of the order have been examined. In our opinion they are either without merit or are premature at this stage of the proceedings.

---

2. The company, moreover, has taken exception in its brief to the reference to

disputed testimony rather than findings in the Board's brief.