977 F.2d 1168
 141 L.R.R.M. (BNA) 2546, 61 USLW 2275,
123 Lab.Cas. P 10,433
 GRAPHIC COMMUNICATIONS INTERNATIONAL UNION, LOCAL 508
O-K-I, AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
and
Nielsen Lithographing Company, Intervening-Respondent.
 No. 91-3901.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 25, 1992.
Decided Oct. 21, 1992.
 
 Lee W. Jackson, Martin Ganzglass, O'Donnell, Schwartz & Anderson, Washington, D.C., Thomas F. Phalen, Jr. (argued), Logothetis & Pence, Cincinnati, Ohio, for petitioner.
 Robert J. Englehart (argued), N.L.R.B., Contempt Litigation Branch, Aileen A. Armstrong, Appellate Court, Enforcement Litigation, Washington, D.C., for respondent.
 Lawrence T. Zimmerman (argued), Washington, D.C., Charles M. Roesch, Dinsmore & Shohl, Cincinnati, Ohio, for intervening respondent.
 Before BAUER, Chief Judge, and POSNER and EASTERBROOK, Circuit Judges.
 POSNER, Circuit Judge.
 
 
 1
 This petition by a union to review an order of the National Labor Relations Board requires us once again to consider the duty of an employer to open its books to the union upon demand. In June of 1983 the union and the employer (Nielsen Lithographing Company) began negotiations for a new collective bargaining agreement to replace the existing agreement, which was about to expire. The company demanded 76 concessions designed to reduce its labor costs. It did not base the demand on any claim that it was in financial jeopardy, strapped for cash, broke or about to go broke, unprofitable, or otherwise unable to pay the existing level of wages and fringe benefits. It claimed merely that it needed the concessions "to compete": "the costs in our contract [the existing collective bargaining agreement] were prohibitive"; "the competitive edge ... was changing, and ... there was a problem with competition now that they hadn't had in the past." Nielsen had once had better equipment than its competitors, enabling it to compete effectively even though its labor costs were higher. No longer. The competitors were getting better equipment. "[T]he company was making a profit ... [but] couldn't compete. The trends showed them that they would have a worse problem in the future." "Try as we may, we simply can not compete with them." "To protect the jobs of our employees we must protect our ability to compete." "To survive we must be able to compete." "It is your job that is on the line.... [W]e have to be able to compete people-wise also. If we don't the recent trend of losing even greater amounts of work to other companies will continue and the jobs our employees now have will also be lost." And so on in this vein. Nielsen backed up these claims with statistics showing that its output had dropped in recent years, that the number of employees in the bargaining unit had dropped by 20 percent since 1980 through layoff and attrition, that its geographically proximate competitors had acquired the equipment (the "half-web" press) that had given Nielsen its competitive advantage, and that these competitors paid their employees lower wages and fringe benefits for longer hours.
 
 
 2
 The union responded to this demand, made in the second bargaining session for the new contract, with a demand for detailed financial information, including the company's financial statements and tax returns for the past three years, the projected balance sheets and income statements that the company had submitted to banks to obtain loans, and information concerning the salaries and perquisites of the company's managerial employees. The company refused to supply the requested information, declared (after six months of bargaining and 22 bargaining sessions) an impasse, and unilaterally imposed the concessions that it had demanded from the union. This precipitated a strike. A few months into the strike the union made an unconditional offer for the striking workers to return to work. But by that time the company had hired permanent replacements for all the striking workers. The union filed charges with the Board, claiming that it had been striking in protest against the company's unfair labor practice in refusing to turn over the requested information. If so, the workers who had struck were entitled to get their jobs back; if not, not. NLRB v. Mackay Radio & Telegraph Corp., 304 U.S. 333, 345-46, 58 S.Ct. 904, 910-11, 82 L.Ed. 1381 (1938); NLRB v. Jarm Enterprises, Inc., 785 F.2d 195, 202 (7th Cir.1986).
 
 
 3
 Originally the Board sided with the union. We reversed (854 F.2d 1063 (7th Cir.1988)) because the Board had ignored our decision in NLRB v. Harvstone Mfg. Corp., 785 F.2d 570, 575-77 (7th Cir.1986), which had held that if the employer does not base its demand for concessions on a claimed inability to pay--in which event NLRB v. Truitt Mfg. Co., 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027 (1956), would entitle the union to demand substantiation by the employer's financial records--the union has no right to demand such records. See also General Electric Co. v. NLRB, 916 F.2d 1163, 1172 (7th Cir.1990); Washington Materials, Inc. v. NLRB, 803 F.2d 1333, 1338-39 (4th Cir.1986). On remand, the Board, rather than simply reinstating its original decision with a disapproving glance at our decision in Harvstone or an effort at distinguishing it, reexamined its position from the ground up; concluded that our decision was correct and should be adopted as the Board's position; and dismissed the unfair labor practice charges. The union argues that we should either overrule or distinguish Harvstone.
 
 
 4
 A request (invariably by the union) for information in a negotiation for a collective bargaining agreement is like a discovery demand in a lawsuit. NLRB v. Acme Industrial Co., 385 U.S. 432, 437, 87 S.Ct. 565, 568, 17 L.Ed.2d 495 (1967); Chicago Tribune Co. v. NLRB, 965 F.2d 244, 246-47 (7th Cir.1992); NLRB v. Illinois-American Water Co., 933 F.2d 1368, 1378 (7th Cir.1991). It can be motivated by a genuine desire for relevant information, or it can be designed to harass. In the first case, although the desire is by hypothesis genuine, the union may be mistaken in thinking the information demanded relevant. If it is relevant, the union--provided it doesn't already have the information, a significant qualification in this case, as we shall see--is entitled to it as a corollary of the statutorily protected right of collective bargaining. Id. at 1377; NLRB v. Burkart Foam, Inc., 848 F.2d 825, 833 (7th Cir.1988).
 
 
 5
 The second case--that of a request designed to harass--has a tripartite structure. The union may want the information because it is embarrassing to the company, in which event either the company may make bargaining concessions to avoid having to reveal it or the workers' support for the union may increase because the revelations make the workers angry at the company. The union may want the information in the hope that the company will refuse its demand, thereby handing the union a legal issue that may enable it to convert an economic strike into an unfair labor practice strike and thus get its members reinstated when the strike is over. Or the union may want the information simply in order to delay the evil day on which the company cuts the workers' wages and fringe benefits; and the threat of delay may cause the company to moderate its demands.
 
 
 6
 The third point will bear some elaboration. The possibility of delay arises because the company can unilaterally institute changes in the wages and working conditions of its workers as soon as bargaining reaches a dead end ("impasse"). Richmond Recording Corp. v. NLRB, 836 F.2d 289, 293 (7th Cir.1987); National Metalcrafters v. McNeil, 784 F.2d 817, 827 (7th Cir.1986). The longer that takes, the longer the workers will continue to receive the benefits of the superior terms of the existing contract. And the bargaining will take longer the more information the company has to disclose, especially if the information provides a basis for further discussion. The union suspects that Nielsen pays its supervisory employees too generously, has too many company cars, and so forth, so if it can find out exactly what those employees' pay and perquisites are it can formulate alternative proposals to Nielsen's for cutting costs, and those proposals will take time to discuss. Maybe not much time, however. First National Maintenance Corp. v. NLRB, 452 U.S. 666, 101 S.Ct. 2573, 69 L.Ed.2d 318 (1981), teaches that the union could not compel the company to bargain to impasse over such matters, as they are not mandatory subjects of collective bargaining. Id. at 674-75 and n. 13, 101 S.Ct. at 2578-79 and n. 13; 29 U.S.C. §§ 158(a)(5), (b)(3). The company can greet a request to bargain over nonmandatory subjects with a curt refusal, or cut off discussion at any time. NLRB v. Davison, 318 F.2d 550, 557-58 (4th Cir.1963); Royal Typewriter Co. v. NLRB, 533 F.2d 1030, 1039 n. 10 (8th Cir.1976).
 
 
 7
 All that we take Truitt to hold is that the union is entitled to obtain from the employer information that is relevant to substantiating the claims made by the employer in the bargaining process. If the employer claims that it cannot afford to pay a higher wage or, as here, the existing wage, the union is entitled to demand substantiation in the employer's financial records. Otherwise the employer would have an unfair advantage in bargaining, because it would be making an express or implied threat (of bankruptcy) that the union could not evaluate. That was Truitt. But there isn't a hint of that here, as there was not in Harvstone. All that Nielsen was claiming was that if it didn't do anything about its labor costs it would continue to lose business and lay off workers. It didn't claim that it was in any financial trouble. From a financial standpoint, it was prepared to concede, it could continue losing business and, to minimize its costs at a lower volume of output, cutting jobs. It might be profitable at one percent of its current output, depending on conditions of demand, the structure of its debt, and the shape of its average cost curve. But no one supposes that the National Labor Relations Act obligates a company to negotiate with a union over whether to shrink its operations to the point at which it has a single employee, who is receiving a princely wage. Codetermination is not the theory of the Act. The company decides its scale of operations. The union has no say. First National Maintenance Corp. v. NLRB, supra, 452 U.S. at 676, 101 S.Ct. at 2579; cf. Chicago & North Western Transportation Corp. v. Railway Labor Executives' Ass'n, 908 F.2d 144, 152 (7th Cir.1990). So the fact that the company might be profitable with fewer employees, or for that matter with the same number of employees paid the current high wages--though in that event the company's profitability would undoubtedly be severely impaired--was irrelevant to the bargaining.
 
 
 8
 The analogy to pretrial discovery is again helpful. Suppose that in a lawsuit one party demands information X from the other party in order to establish fact Y. Rather than produce the information, the other party stipulates to Y. That would moot the request for the information. It is the same here. The union wanted the company's financial statements in order to establish that the company could afford to continue to pay the wages and fringe benefits fixed in the current contract. The company mooted the demand by conceding that it could afford them.
 
 
 9
 Analysis of the union's request for information about the salaries, number, and perks of the company's supervisory and executive employees proceeds similarly. The company claimed that to stem the hemorrhage of its business it had to cut the compensation of its hourly workers. Well, was that true? Maybe the company had a bloated headquarters staff, and could have effected the desired reduction in its labor costs by a long overdue cut in the salaries and perks and size of that staff. But the company had not said to the union: we must cut somewhere or go under. It had conceded that it could afford to continue paying the wages and fringes fixed in the current contract. Whether it could do so at least pain to itself by cutting dividends or by cutting headquarters staff or executive salaries was no business of the union.
 
 
 10
 The union had all the information it needed to decide whether to knuckle under to the company's demands or call a strike. It knew that the company was not acting under pressure of financial necessity and therefore might bend if the union could apply enough countervailing pressure on company profits by striking. Neither it nor the workers needed any more information to make an informed decision on whether to strike.
 
 
 11
 The Act does not require employers to be equitable in their dealings with their employees. An employer can be as greedy as it pleases. If it makes claims of poverty, or any other substantiatable factual claim, it must substantiate the claims if the union so demands. If it disclaims poverty, it moots any request for information that would be relevant only if poverty were being claimed. Nielsen did make substantiatable factual assertions concerning competition (and hence) demand, and the relation between its hourly workers' compensation and that of its competitors, but it was prepared to substantiate those assertions--in fact no one doubts that they were true. The company that says it will do whatever it can to maximize its profits by minimizing its labor costs invites a test of strength with its unions. It does not commit an unfair labor practice.
 
 
 12
 The petition for review of the Board's order is
 
 
 13
 DENIED.