# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

INTERNATIONAL CHEMICAL WORKERS
UNION COUNCIL OF THE UNITED
FOOD & COMMERCIAL WORKERS
INTERNATIONAL AND ITS LOCAL 1C,
                        *Petitioner,*

v.

NATIONAL LABOR RELATIONS
BOARD,

                        *Respondent.*

No. 04-72270

NLRB No.
31-CA-25761

ORDER AND
AMENDED
OPINION

On Petition for Review of an Order of the
National Labor Relations Board

Submitted December 8, 2005*
Pasadena, California

Filed April 28, 2006
Amended June 30, 2006

Before: Harry Pregerson, Robert E. Cowen,** and
Sidney R. Thomas, Circuit Judges.

Opinion by Judge Pregerson

---

*This panel unanimously finds this case suitable for decision without oral argument. *See* Fed. R. App. P. 34(a)(2).

**The Honorable Robert E. Cowen, Senior United States Circuit Judge for the Third Circuit, sitting by designation.

## COUNSEL

Randall Vehar, Trial Counsel, and Robert W. Lowrey, ICWUC/UFCW Legal Department, Akron, Ohio, for the petitioner.

Aileen A. Armstrong, Deputy Associate General Counsel, NLRB, Washington, D.C., for the respondent.

## ORDER

The petition for rehearing is granted without further oral argument.

The Opinion filed on April 28, 2006, and appearing at 447 F.3d 1153, is amended as follows:

At 447 F.3d at 1165, the sentence currently reading "Petition GRANTED." shall be replaced with the following: "The Union's petition for review is GRANTED, and the matter is REMANDED to the National Labor Relations Board with directions to reinstate the ALJ's January 24, 2003 Decision and Order."

Petition for rehearing GRANTED; opinion AMENDED; and the case REMANDED with instructions. No further petitions for panel rehearing or rehearing en banc may be filed.

## OPINION

PREGERSON, Circuit Judge:

Petitioner International Chemical Workers Union Council of the United Food and Commercial Workers International and Its Local 1C ("Union") petitions this court for review of

a decision by the National Labor Relations Board ("Board"). This case arises out of events that took place while the Union and American Polystyrene Corporation ("Company") were in negotiations for a successor collective bargaining agreement. Applying the rule announced by the Supreme Court in *NLRB v. Truitt Mfg. Co.*, 351 U.S. 149 (1956), the Board held that the Company bargained in good faith, even though it refused a request by the Union to turn over its financial documents. *Am. Polystyrene Corp.*, 341 N.L.R.B. No. 67, 2004-2005 NLRB Dec. ¶ 16,656 (Mar. 30, 2004). We hold that substantial evidence does not support the Board's conclusion that the Company bargained in good faith. The Company clearly asserted an inability to pay that, under *Truitt*, required it to disclose corroborative documents to the Union. Furthermore the Company never effectively retracted its claim that it could not afford to pay for the Union's proposals. We have jurisdiction pursuant to 29 U.S.C. § 160(f), and we grant the petition for review.

## I.    Factual Background

The Company manufactures plastics at its Torrance, California facility. During the relevant period, the Union represented the Company's eight-person production and maintenance unit and was party to a 1999-2002 collective bargaining agreement covering those employees.

On April 22, 2002, the Company and the Union held their first meeting to negotiate a successor collective-bargaining agreement. Union representative Jeffrey Ferro ("Ferro") presented the Union's proposals, which included increases in wages and company contributions to employee 401(k) plans. In response, at the April 23rd bargaining session, Company General Manager Carolyn Tan ("Tan") proposed smaller wage increases, discontinuation of company 401(k) contributions for an unspecified period, and the elimination of company-provided meals.

At the April 29th bargaining session, the Company proposed to discontinue its 401(k) fund matching for one-year. After a discussion of the Company's counterproposals, Ferro asked if "things were really that bad" that the Company could not continue to match the 401(k) plans, provide meals, or provide a meaningful wage increase. Tan replied that "things are tough." Ferro asked, "Are you saying that you can't afford the Union's proposals?" Tan replied, "No, I can't. I'd go broke."

At the end of the April 29th session, Ferro composed the following letter on his laptop computer and hand delivered it to Tan:

> Based on your responses on April 23 and today to Union Proposals . . . and the fact that you claim that things are tough and the Company cannot afford these items, the Union demands access to review the Company's books. Please let us know when they will be available for our review, so we can make arrangements for our accountant[']s schedule.

On April 30th, in a hand-delivered letter to the Union, Tan responded:

> I am in receipt of your letter dated April 29, 2002, in which you request access to the Company's books. I am rejecting this request. While I have told you that we are a small company and times are tough, at no time have I ever told you we cannot afford your proposals. Rather, in these uncertain economic times, we believe that we need to take a more cautious approach than what you propose. I hope this clears up any confusion that you have regarding our responses to your proposals.

At the next bargaining session on May 2nd the parties discussed the Company's financial condition again. During the

session, Ferro asked if business was really that bad. Tan replied, "Have you seen sales lately?"

The topic of the Company's financial health came up again during the next bargaining session, on May 14th. Tan stated that the Company was not taking the position that it was experiencing financial hardship. Ferro asked why the Company had proposed "all these take aways." Tan, responding specifically to the inquiry about the Company's meal plan, stated that other companies were not providing meal coverage. By hand-delivered letter to Tan dated May 14th, Ferro wrote:

> We have reviewed our notes and our understanding of what has been said by you . . . and it is clear that you said you could not afford the Union[']s proposals or to continue paying meal allowances or matching money on the employee's 401K. During one session our notes reflect the following dialog:
>
> Union:      Are things that bad that you can't continue to pay meal allowances and continue to match the 401K plan?
>
> Carolyn:  Things are tough.
>
> Union:      So are you saying you cannot afford the Union[']s proposals?
>
> Carolyn:  No I can't. I'd go broke.
>
> Therefore, by this statement, your proposals to freeze 401K matches for one year, to discontinue meal allowance and your efforts to have non-bargaining unit employees, the Union again demands access to review the Company's Financial Records. Failure to comply will result in the filing of Unfair

Labor Practice Charges with the National Labor Relations Board.

Tan responded by letter the same day:

> I am in receipt of your letter dated May 14, 2002, that I received today in which you assert that I told you that American Polystyrene could not afford the union proposals. You further contend that your notes reflect that I said, "No I can't. I'd go broke." I never said these words or anything similar. As I wrote you in my last letter, I have never stated that we could not afford any of your proposals. The fact of the matter is that after I informed you that times are tough, you asked me, "Are things that bad?" I responded, "Have you looked at sales." Because I have never told you that we cannot afford any of your proposals, it would be inappropriate for me to allow you access to our financial records, and hence, I am denying your request.

On June 18th, the Union filed an unfair labor practice charge with the Board alleging, in part, that the Company refused to supply information to the Union in violation of Section 8(a)(5) of the National Labor Relations Act ("Act"), 29 U.S.C. § 185(a)(5).

On August 1st, Tan notified the Union that due to unimproved sales and rising inventories, the Company planned to stop production and lay off some employees beginning August 30th, for approximately ninety days. On August 30th, the Company laid off six of the eight unit members.

On September 4th, the Union again requested access to the Company's financial records. By letter dated September 6th, the Company again refused the Union's request to see its financial records.

## II.  Administrative Proceedings

### A.  Before the ALJ

The Administrative Law Judge ("ALJ") found that the Company violated Sections 8(a)(5) and (1) of the Act when it "refus[ed] to provide the [Union] with requested information to substantiate a claim that it [could not] afford to agree to bargaining demands." The ALJ held that Tan "specifically stated during negotiations that the company could not afford the union's proposals"[1] and then repeatedly denied making the statement. The ALJ found that the totality of the Company's conduct was consistent with a claim of inability to pay: (1) the Company had "proposed reducing contractual benefits"; (2) the Company "said it would 'go broke' if it met the Union's proposals"; and (3) the Company "instituted an economic lay-off of most of the unit employees." Further, "even while denying the 'go broke' statement, [Tan had] said that 'things are tough.'" Relying on *Lakeland Bus Lines, Inc.* (*Lakeland I*), 335 N.L.R.B. 322 (2001), the ALJ found that those actions, which followed Tan's "No, I can't. I'd go broke" statement, could not constitute a retraction of the "I'd go broke" statement, and thus, that the Company had not shed its duty to disclose corroborative evidence. The ALJ held that by refusing to provide the Union with the requested financial information, the Company committed an unfair labor practice under Sections 8(a)(5) and (1) of the Act.

### B.  Before the Board

On appeal, a 2-1 majority of the Board reversed the ALJ. First, the Board held that Tan's statement that the Company would "go broke" was not necessarily a claim of inability to pay. Moreover, the Board determined that the Company's

---

[1]The ALJ credited Ferro's testimony that Tan had said the Company would "go broke" if it acceded to the Union's demands. Neither party disputes the ALJ's finding.

response to the Union's request for information "unequivocally advised the Union that the [Company's] ability to pay for the Union's bargaining proposals was not in question." Because, in the Board's opinion, the Company had clarified its bargaining position within a day of the alleged inability to pay, the Company had absolved itself of any duty to provide the requested financial information. Accordingly, the Board found nothing in Tan's denials to suggest that the Company was bargaining in bad faith. The Union appealed.

## III.   Analysis

The Board "has the primary responsibility for developing and applying national labor policy." *Glendale Assocs., Ltd. v. NLRB*, 347 F.3d 1145, 1150 (9th Cir. 2003). So long as the Board's interpretation is "rational and consistent" with the Act, its rulings are afforded "considerable deference." *Id.* at 1151. The Board's order will be upheld on appeal if "its findings of fact are supported by substantial evidence and if it correctly applied the law." *NLRB v. Int'l Bhd. of Elec. Workers, Local 48*, 345 F.3d 1049, 1053 (9th Cir. 2003).[2]

**[1]** During the course of negotiations, "[g]ood-faith bargaining necessarily requires that claims made by either bargainer should be honest claims." *Truitt*, 351 U.S. at 152. In *Truitt*, the Supreme Court held that if an employer asserts an inability to pay for a union's demands, "it is important enough

---

[2]Citing *Penasquitos Village, Inc. v. NLRB*, 565 F.2d 1074 (9th Cir. 1977), the Union contends that a less deferential standard of review is appropriate in this case. The *Penasquitos Village* court held that "a reviewing court will review more critically the Board's *findings of fact* if they are contrary to the administrative law judge's *factual conclusions*." *Penasquitos Village, Inc.*, 565 F.2d at 1078 (emphasis added). Here the Board did not explicitly or implicitly overrule any of the ALJ's factual findings. Indeed, *Penasquitos Village* recognized that the " 'substantial evidence' standard is not modified in any way when the Board and [an ALJ] disagree." *Id.* at 1076 (citation omitted). The substantial evidence standard is appropriate in this case.

to require some sort of proof of its accuracy." *Id.* at 152-53. Thus, a "refusal to attempt to substantiate a claim of inability to pay increased wages may support a finding of a failure to bargain in good faith." *Id.* at 153.

The *Truitt* Court explicitly limited its holding, however, stating that

> [w]e do not hold . . . that in every case in which economic inability is raised as an argument against increased wages it automatically follows that the employees are entitled to substantiating evidence. Each case must turn on its particular facts. The inquiry must always be whether or not under the circumstances of the particular case the statutory obligation to bargain in good faith has been met.

*Id*. at 153-54. Therefore, here we consider whether the Company's actions as a whole satisfied its statutory obligation to bargain in good faith.[3] *See NLRB v. W. Wirebound Box Co.*,

---

[3]Cases from other circuits have stated that the Supreme Court's cautionary language has a very limited effect. Those cases hold that "[a]lthough there is language in . . . *Truitt* that might support [the position that a refusal to supply properly requested financial information is not *per se* bad faith bargaining], the general consensus today is that 'for all practical purposes' a refusal to disclose alone constitutes a failure to bargain in good faith." *NLRB v. Harvstone Mfg. Corp.*, 785 F.2d 570, 579 (7th Cir. 1986) (citations omitted); *see also Teleprompter Corp. v. NLRB*, 570 F.2d 4, 9 n.2 (1st Cir. 1977). The Board affirmed this interpretation in 1991. *See Ameron Pipe Prods.*, 305 N.L.R.B. 105, 109 n.7 (1991) ("Although the [Supreme] Court limited its holding, the case has become widely accepted as establishing for all practical purposes such an 'automatic' rule.").

*Harvstone*, *Teleprompter*, and *Ameron Pipe Products* have never been overruled or criticized for using a simple, mechanical application of *Truitt* when a company asserts an inability to pay. Nevertheless, this court must adhere to the Supreme Court's mandate and thus, should accord the relevant language appropriate deference. *See Mesa Verde Constr. Co. v. N. Cal. Dist. Council of Laborers*, 861 F.2d 1124, 1129-31 (9th Cir. 1988) (en banc) (holding that circuit court should defer to Supreme Court's interpretation of the Act). Moreover, those cases are out-of-circuit authority, which are not binding on us.

356 F.2d 88, 91 (9th Cir. 1966) (analyzing ALJ decision in light of *Truitt* cautionary language); *see also Lakeland Bus Lines, Inc. v. NLRB* (*Lakeland II*), 347 F.3d 955, 961 (D.C. Cir. 2003); *Rivera-Vega v. ConAgra, Inc.*, 70 F.3d 153, 159 n.5 (1st Cir. 1995); *Torrington Extend-A-Care Employee Ass'n v. NLRB*, 17 F.3d 580, 588 (2d Cir. 1994).

## A. Whether the Company's assertions constituted a claim of inability to pay

We first consider whether the Company's actions triggered a duty that required the Company to disclose its financial records. We must determine whether the "essential core of the [company's] bargaining posture as a whole, as expressed to the Union, was grounded in assertions amounting to a claim that it could not economically afford" to pay for the Union's proposals. *Rivera-Vega*, 70 F.3d at 160 (quoting *The Shell Co.*, 313 N.L.R.B. 133, 133 (1993)).[4] We ascertain the Com-

---

[4]In *Western Wirebound Box Co.*, this court extended the *Truitt* rule to cover employer denials of wage increases based on claims of "competitive disadvantage." 356 F.2d at 90-91. We held that *Truitt* is "not confined to cases where the employer's claim is that he is unable to pay the wages demanded by the union." *Id.* at 90. We concluded that "[w]e see no reason why, under the same rationale, an employer who insistently asserts that competitive disadvantage precludes him from acquiescing in a union wage demand, does not have a like duty to come forward, on request, with some substantiation." *Id.* at 91.

Until 1991, the Board and other circuits generally agreed with the *Western Wirebound Box Co.* expansion of *Truitt*. *See*, *e.g.*, *United Steelworkers of Am., AFL-CIO, Local 5571 v. NLRB*, 401 F.2d 434, 436 (D.C. Cir. 1968); *Int'l Tel. & Tel. v. NLRB*, 382 F.2d 366, 370-371 (3d Cir. 1967); *NLRB v. Celotex Corp.*, 364 F.2d 552 (5th Cir. 1966); *but see Facet Enters., Inc. v. NLRB*, 907 F.2d 963, 980 (10th Cir. 1990) (citing *Harvstone Mfg. Corp.*, 785 F.2d at 575) (noting that distinction exists between claims of competitive disadvantage and claims of inability to pay). In 1991, the Board changed course in *Nielsen Lithographing Co.*, 305 N.L.R.B. 697 (1991). There, the Board first recognized a distinction between claims of "inability to pay," which give rise to the disclosure duty, and claims of "competitive disadvantage," which do not. *Id.* at 701.

pany's intent from "the *substance* of the employer's bargaining position, not the formal words used by the employer." *Id.* at 159. Indeed, it is often recognized that "[a]lthough no magic words are required to express an inability to pay, the words and conduct must be specific enough to convey such a meaning . . . ." *United Paperworkers Int'l Union v. NLRB*, 981 F.2d 861, 865 (6th Cir. 1992) (quoting *Harvstone Mfg. Corp.*, 785 F.2d at 575); *see also New York Printing Pressmen Local 51 (Milbin Printing) v. NLRB*, 538 F.2d 496, 500 (2d Cir. 1976) ("So long as the Employer's refusal reasonably interpreted is the result of financial inability to meet the employees' demand rather than simple unwillingness to do so, the exact formulation used by the Employer in conveying this message is immaterial.").

---

"The test for determining whether an employer has communicated such an inability is whether it asserts that it 'cannot,' as opposed to 'will not,' pay a particular wage demand." *Facet Enters., Inc.*, 907 F.2d at 980 (citing *Harvstone Mfg. Corp.*, 785 F.2d at 575). This reasoning has been adopted by many other circuits. *See Torrington Extend-A-Care Employee Ass'n*, 17 F.3d at 588-90; *United Steelworkers of Am., AFL-CIO-CLC, Local Union 14534 v. NLRB*, 983 F.2d 240, 244-45 (D.C. Cir. 1993); *Graphic Commc'ns Int'l Union, Local 508 O-K-I, AFL-CIO v. NLRB*, 977 F.2d 1168, 1171 (7th Cir. 1992); *see also ConAgra, Inc. v. NLRB*, 117 F.3d 1435, 1438-42 (D.C. Cir. 1997) (detailing the history of the Board's "change of heart").

In the instant case, we need not address the way the law has diverged from the rule announced in *Western Wirebound Box Co.*; this case does not turn on the distinction between claims of inability to pay versus claims of competitive disadvantage. Moreover, even if this case called for such analysis, this panel may not overrule a prior decision of this court. *See In re Complaint of Ross Island Sand & Gravel*, 226 F.3d 1015, 1018 (9th Cir. 2000). And though we cite heavily from out-of-circuit cases that recognize the distinction, we do not intend to suggest that *Western Wirebound Box Co.* was wrongly decided. Indeed, at least one judge has called the dichotomy into question. *See ConAgra, Inc.*, 117 F.3d at 1447-50 (Wald, J., concurring) ("I believe that the Board's *Neilsen* rule has weakened the 'gravitational field of *Truitt*' too severely for that opinion to retain its vitality, and hope that the Board will see fit to reexamine its *Neilsen* rule in the near future, and adopt an alternative more consistent with the spirit of *Truitt* and the purposes of the Act." (citation omitted)).

Here, at the April 29th bargaining session, Ferro asked, "So are you saying you cannot afford the Union's proposals?" Tan responded, "No, I can't. I'd go broke." The Board concluded that Tan's "go broke" statement did not "[rise] to the level" of an inability to pay and therefore, that the statement did not trigger the attendant *Truitt* duty to disclose. We take issue with the Board's conclusion for two reasons. First, the Board too quickly dismissed the fact that "I'd go broke" represented an inability to pay. Second, the Board's analysis was too narrow and ignored the rest of the statements made by the Company during negotiations.

### 1.  When Tan said, "No I can't. I'd go broke" she asserted an inability to pay

We disagree with the Board's cursory analysis of Tan's statement. The Board limited its analysis of Tan's "No, I can't. I'd go broke" comment to two isolated statements in its decision. First, the Board stated that the comment was made "during the heat of bargaining." Later, the Board noted that the statement was made "orally, during the heat of a negotiating session, not reflectively in a letter." Based on those observations alone, the Board determined that Tan's assertion that the Company would "go broke" did not "[rise] to the level of a claimed inability to pay."

Purporting to adhere to the Supreme Court's warning against automatically applying the *Truitt* disclosure requirement, the Board seemed to apply its own *per se* rule. The Board held, in essence, that a plea of poverty made during the "heat of bargaining" could never create an employer's duty to disclose corroborative financial documents. The Board misinterprets *Truitt*'s cautionary language, through which the Court warned that not every employer that claimed an inability to pay was required to disclose supporting evidence. *See Truitt*, 351 U.S. 153-54. The Court did not hold that oral claims of inability to pay made during bargaining would never trigger the Company's duty to disclose, but that is what the Board

seems to imply. The Supreme Court was clear that any claimed inability to pay followed by a refusal to substantiate that inability "*may* support a finding of a failure to bargain in good faith." *Id.* at 153 (emphasis added).

Here, the Board ignored the obvious fact that Tan proclaimed the Company's inability to pay for increased benefits. Ferro asked, "So are you saying you cannot afford the Union's proposals?" In response, Tan replied, "No, I *can't*. I'd go *broke*." Although "no magic words are required to express an inability to pay," *United Paperworkers Int'l Union*, 981 F.2d at 865, the Company could not have used simpler words to declare that its financial situation was the cause of its refusal.

**[2]** An asserted inability to pay, whether made in writing or orally, is the cornerstone of an alleged *Truitt* violation. Clear statements of a company's inability to pay cannot be cast aside as abruptly as the Board did here. The Company's statements of inability to pay, i.e., "No, I can't. I'd go broke," coupled with its refusal to substantiate, strongly, but do not conclusively, suggest that the company bargained in bad faith, regardless of whether the statement was made during heated negotiations. *See Lakeland I*, 335 N.L.R.B. at 324-25 (holding oral statements by company sufficient to require disclosure of relevant financial information under *Truitt*); *Fairhaven Props., Inc. (Central Mgmt. Co.)*, 314 N.L.R.B. 763, 769 (1994) (holding that where company made statements constituting inability to pay orally at bargaining sessions, company had duty to show its books to the union). We therefore hold that substantial evidence does not support the Board's conclusion that the statement — "No I can't. I'd go broke" — itself was not representative of an inability to pay.

### 2. The Board failed to look at the "circumstances of the particular case"

It is clear to us that when Tan said "No, I can't. I'd go broke," she communicated to the Union that the Company

was unable to pay for the Union's proposals. Viewing that statement in light of the Company's subsequent letters and actions further convinces us that the Company's actual position was one of inability to pay. The Board looked at Tan's statement in isolation, and ignored the Company's other statements, as well as the context of the negotiations. The Board should have considered the company's communications *in full* to determine whether the company's "refusal reasonably interpreted [was] the result of financial inability to meet the [Union's] demand." *New York Printing Pressmen and Offset Workers Union No. 51*, 538 F.2d at 500; *see also Truitt*, 351 U.S. at 153-54 (explaining that analysis must focus on the "circumstances of the particular case").

That the Company continued to plead poverty is supported by Tan's subsequent statements to the Union.[5] These communications should be considered when determining the "context" of the Company's bargaining position. *See Lakeland II*, 347 F.3d at 962-63 (criticizing Board for failing to consider "the entire course of negotiations in determining whether the Company was truly pleading an inability to pay"); *Harvstone Mfg. Corp.*, 785 F.2d at 583 (Swygert, J., concurring in part and dissenting in part) (commenting that statements of company viewed within entire bargaining context could lead union rationally to conclude that company was asserting financial inability to pay). Each of the Company's communications, whether oral, in writing, or through action, implied that the company was economically incapable of meeting the Union's requests.

**[3]** In her first attempt to deny that she had said "No, I can't. I'd go broke," Tan stated, "times are tough . . . in these uncertain economic times, we believe that we need to take a more cautious approach than what you propose." This conveyed that the Company was in a precarious position; it did

---

[5]We analyze Tan's purported disavowal of her "I'd go broke" statement below in Section III.B.

not *want* to be more cautious, it *needed* to be. Also, as Tan later admitted, in response to the Union's requests for increased wages and benefits, she had asked, "Have you looked at sales?" This question suggests that in light of the Company's poor sales figures, the Company *could not* reasonably have entertained the Union's requests for increased wages and benefits. Finally, Tan sent an e-mail to Ferro stating that due to "unimproved sales and rising inventories," the Company was planning to lay off workers. Tan was again focusing on the severe impact its decreased sales were having on the Company.

**[4]** We also consider a company's conduct when evaluating the actual substance of its position. *See United Paperworkers Int'l Union*, 981 F.2d at 865; *see also The Shell Co.*, 313 N.L.R.B. at 133 (considering significant the fact that company had expressly referred to steps taken to address its survival, namely that it had instituted a hiring freeze and implemented an early retirement plan). Here, two actions by the Company merit attention. First, during bargaining, Tan proposed *reducing* benefits, specifically the 401(k) contributions.[6] Tan's stated reasons for reducing the 401(k) contributions were that "things were tough," and that the Company would "go broke" which, as noted, suggest that the Company could not continue paying for the contributions. Second, the Company threatened, and then instituted, an economic layoff of most of the unit employees. The layoff was directly tied to the financial instability of the Company. Thus, the Company did not only state that it could not pay for more benefits; its actions were those of a company that could not sustain itself if forced to pay for the Union's proposals.

---

[6]The Company also proposed eliminating the employee meal plan, but at one point justified that proposed reduction by stating that other companies were not providing the same plan. Because, in an abundance of caution, we do not rest our ultimate conclusion on any claims of competitive disadvantage by the Company, *see* n.4, *supra*, we do not consider the meal plan reduction proposal in determining whether the Company's representations constituted an inability to pay.

**[5]** The obvious interpretation of the Company's conduct was that its financial health was to blame for its refusal to pay for the Union's proposals. The Company opened the door to its plea of poverty when Tan first said "No, I can't. I'd go broke," and never wavered from that position in its later communications. In our opinion, there is insufficient evidence to support the Board's conclusion that the Company did not assert an inability to pay. The record shows that, as the ALJ concluded, the Company continued to assert an inability to pay and thus, under *Truitt*, should have provided corroborative evidence in support of its bargaining position.

### B.   Whether the Company Disavowed Its Claim of Inability to Pay

**[6]** The Board has recognized that a company can shed its obligation to furnish financial information if it truthfully and properly communicates a disavowal of its previous assertions of inability to pay.[7] *See Lakeland I*, 347 F.3d at 963-64; *Fairhaven*, 314 N.L.R.B. at 769. This rule fits nicely with the Supreme Court's instruction that the "inquiry must always be whether or not . . . the statutory obligation to bargain in good faith has been met." *Truitt*, 351 U.S. at 153-54. Thus, if a disavowal is not made "disingenuously or in bad faith," a company is absolved of its duty to disclose its financial documents. *Lakeland II*, 347 F.3d at 964.

**[7]** A company must make it "unmistakably clear" to a union that it has abandoned its plea of poverty. *Id.* at 963.

---

[7]For clarity, and because other courts have done so, we consider separately whether the Company retracted its claim of inability to pay. *See Lakeland I*, 347 F.3d at 963-64 (noting that Board first concluded employer asserted an inability to pay, then considered whether there was an adequate retraction); *Fairhaven*, 314 N.L.R.B. at 769. We note, however, that the relevant inquiry is simply an extension of the analysis in the previous section of this opinion; we continue to consider the Company's statements in context as well as "the circumstances of [this] particular case." *Truitt*, 351 U.S. at 153.

Because the analyses are intertwined, as with an initial claim of inability to pay, we should examine "the *substance* of the employer's bargaining position, not the formal words used by the employer," when deciding whether or not a retraction occurred. *Rivera-Vega*, 70 F.3d at 159. Consequently, once an inability to pay has been asserted, we must be wary about taking all of the employer's statements at face value. Indeed, companies may be "very aware of Board decisions that deal with the different consequences of claiming current inability to pay existing wages," and that a company may "play[ ] semantical games" in an attempt to retreat from its previous position. *The Shell Co.*, 313 N.L.R.B. at 138. As *Truitt* held, "[g]ood-faith bargaining necessarily requires that claims made by either bargainer should be *honest* claims." *Truitt*, 351 U.S. at 152 (emphasis added). Therefore, it would undercut the policy of *Truitt* if we deferred to every purported "retraction" by an employer and failed to question whether such statements were honestly made.

In this case, the Company made a number of statements in response to the Union's requests for financial information. In the April 30th letter, Tan wrote: "While I have told you that we are a small company and times are tough, at no time have I ever told you we cannot afford your proposals. Rather, in these uncertain economic times, we believe that we need to take a more cautious approach than what you propose." In her May 14th letter, responding to the Union's allegation that she had claimed the Company would "go broke," she stated, "I never said these words or anything similar. . . . [Y]ou asked me, 'Are things that bad?' I responded, 'Have you looked at sales.' " Finally, in her September 6th letter, Tan wrote: ". . . I have already stated that I did not say the words that you had quoted. Once again I reject your request to see financial records for the reasons set forth in my letter dated May 14, 2002."

**[8]** The Board majority's opinion that those statements withdrew the Company's claim of an inability to pay is not

supported by substantial evidence. Although at first glance the statements disavow any inability to pay, the Board failed to evaluate the "essential core of the [company's] bargaining posture as a whole," *Rivera-Vega*, 70 F.3d at 159, and ignored the context of the statements. Tan's letters purported to disclaim the precise words "I'd go broke," but at the same time, they affirmed the Company's position that it could not pay for the Union's demands. While on one hand, Tan said "at no time have I ever told you we cannot afford your proposals," she nevertheless maintained that "times are tough." She emphasized the effect that decreased sales were having on the Company by saying, "Have you looked at sales," and proposing reduced benefits in response. The Company also threatened, and then instituted, an economic layoff because of its poor financial condition. In essence, the totality of the Company's conduct "set the stage for negotiations by explaining in broad strokes just what bad shape [the company] was in." *The Shell Co.*, 313 N.L.R.B. at 138. It was against this backdrop that the Company purported to disavow its initial inability to pay. We hold that in spite of these "disavowals," the thrust of the Company's position remained unchanged — it continued to claim it could not pay for the Union's proposals.

This case is distinguishable from *Fairhaven* and *Lakeland II*, in which the Board and D.C. Circuit, respectively, held that companies had effectively disclaimed their earlier pleas of poverty. In *Fairhaven*, the employer claimed an inability to pay in the second bargaining session with the union. *See* 314 N.L.R.B. at 768. After refusing to turn over its financial documents, at the fourth bargaining session, the company provided a written document to the union that stated, "The Company *does not* claim inability to pay." *Id.* at 768-69. The Board held that the statement communicated a retraction to the union, but *only* "in light of the *Union's* admission" that it was "obvious" that the employer was no longer pleading poverty. *Id.* at 769 (emphasis added). The Board suggested that the retraction would not have been sufficient absent the union's admission, because the employer "continued to claim that the economy

was poor, the rent rolls were down, and the profits were less than they had been." *Id.*

*Lakeland II* also dealt with a situation in which the union conceded that the employer had altered its bargaining position. There, the company made statements that it was "trying to bring the bottom line into the black," that acceptance of the final offer would enable the company to "retain [the employees'] jobs and get back in the black in the short term," and that "[t]he future of Lakeland depends on it." *Lakeland II*, 347 F.3d at 958. Denying the union's requests for information, the company's attorney responded: "[T]o set the record straight, I advised that the Company was losing money, not that the company's financial condition precluded it from agreeing to the Union wage proposal. No claim of financial inability, explicit or implicit, was made by myself or any company official." *Id.* at 963. The attorney later wrote that "[a]t no time did I or any Company official claim a present inability to pay or a prospective inability to pay during the life of the contract being negotiated." *Id.* The D.C. Circuit, disagreeing with the Board, held that those clarifying statements made it clear to the union that the company was not pleading poverty. *See id.* Moreover, the court emphasized that the union communicated its own understanding that the company's position had changed — the union had circulated a leaflet to Lakeland's customers, stating that the company "admitted that they were not, in fact, under any hardship from a loss of revenue, but instead, *chose* not to offer any increases in wages." *Id.*

The instant case is unlike *Fairhaven* and *Lakeland II* because the Union never acknowledged that it understood the Company's position to be anything other than an inability to pay. In fact, the Union maintained that, after reviewing its records, "it [was] clear that [the Company] said [it] could not afford the Union's proposals . . . ." Furthermore, *Fairhaven* suggests that in the absence of clear acknowledgment by a union, a "retraction" is not effective if the employer continues to represent its position as one of an inability to pay. *See*

*Fairhaven*, 314 N.L.R.B. at 769 ("*Although* Frank continued to claim that the economy was poor, the rent rolls were down, and the profits were less than they had been, *the Union acceded* to the Respondent's claim that it was no longer pleading poverty." (emphasis added)). Here, the Company continued to say that the Company faced "uncertain economic times," that "times [were] tough," and that decreased sales were forcing the company to institute a layoff. Those representations belied Tan's proclamations that the Company had never asserted an inability to pay; she not only *had* asserted an inability to pay, she actually maintained that position throughout the bargaining process. She denied that she had ever uttered the specific words "I'd go broke," but the remainder of her communications never implied a change in the substance of her position. In short, after she said "No, I can't. I'd go broke," she resorted to "semantical games" in an attempt to retreat from her previous claim of an inability to pay. *The Shell Co.*, 313 N.L.R.B. at 138.

**[9]** In conclusion, it is clear that "[i]n the circumstances surrounding the negotiations," the Company's purported disavowals "amounted to nothing more than a clumsy effort to shed a statutory responsibility to substantiate a bargaining position . . . namely, that financially it could not meet the Union's contractual demands." *C-B Buick, Inc.*, 206 N.L.R.B. 6, 8 (1973). We conclude, therefore, that substantial evidence does not support the Board's holding that the Company bargained in good faith because it attempted to disavow its bargaining position while repeatedly reasserting that very position. Tan's denials that the Company was claiming an inability to pay were not "honest claims." *Truitt*, 351 U.S. at 152. Accordingly, the Company bargained in bad faith when it asserted an inability to pay, failed to turn over the financial documents requested by the Union, and then improperly tried to avoid its duty to disclose.

The Union's petition for review is GRANTED, and the matter is REMANDED to the National Labor Relations Board

with directions to reinstate the ALJ's January 24, 2003 Decision and Order.