Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued September 15, 2003     Decided November 4, 2003

Nos. 02-1260
& 02-1302

LAKELAND BUS LINES, INC.,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

On Petition for Review and Cross-Application
for Enforcement of an Order of the
National Labor Relations Board

*Richard J. Delello* argued the cause and filed the briefs for petitioner. *Alan I. Model* entered an appearance.

*David A. Fleischer*, Senior Attorney, argued the cause for respondent. With him on the brief were *Arthur F. Rosenfeld*, General Counsel, *John H. Ferguson*, Associate General

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

Counsel, *Aileen A. Armstrong*, Deputy Associate General Counsel, and *Charles P. Donnelly*, Supervisory Attorney.

Before: EDWARDS, RANDOLPH, and GARLAND, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* EDWARDS.

EDWARDS, *Circuit Judge*: Petitioner Lakeland Bus Lines, Inc. ("Lakeland" or "the Company") is a private bus company whose drivers are represented by the Amalgamated Transit Union, Local 1614, AFL-CIO ("the Union"). In late 1996, Lakeland and the Union entered into negotiations over a new collective bargaining contract. The parties' existing agreement expired on January 31, 1997. In February 1997, when negotiations failed to produce a new agreement, the Company gave a final offer to the Union. On the same day, Lakeland's President sent a letter to bargaining unit employees detailing the Company's bargaining position and financial difficulties. Shortly thereafter, the Union requested that the Company provide financial information to verify that it could not afford any contract terms that exceeded the costs of its final offer. Company representatives refused to furnish any of the requested information, clarifying that Lakeland had never based its bargaining position on an inability to pay. Lakeland's employees subsequently rejected the Company's final offer. Lakeland then unilaterally implemented the terms of its final offer.

The Union filed unfair labor practice ("ULP") charges against the Company with the National Labor Relations Board ("NLRB" or "the Board") in March 1997, claiming that Lakeland had failed to bargain in good faith in violation of the National Labor Relations Act ("NLRA" or "the Act"). Following issuance of a complaint, the matter was heard by an Administrative Law Judge ("ALJ"). The ALJ dismissed the complaint, finding that Lakeland had never asserted an inability to pay. The Board reversed the ALJ's decision. Although it largely agreed with the ALJ's findings of fact, the Board concluded that the letter from Lakeland's President implicitly asserted an inability to pay that the Company never effectively retracted. The Board therefore concluded that Lakeland had engaged in unfair labor practices by refusing to

furnish the requested information and by unilaterally implementing its final offer in the absence of a valid impasse. Lakeland petitioned this court for review, arguing that the Board's conclusions are not supported by substantial evidence on the record as a whole. The Board filed a cross-application for enforcement.

The Board's decision is not supported by substantial evidence. Viewing the record as a whole, it cannot be found that Lakeland asserted an inability to pay. It is absolutely clear in the record that any statements from the Company that arguably implied an inability to pay were unequivocally clarified and that the Union understood the clarification. We therefore hold that the Board erred in concluding that Lakeland committed ULPs in refusing to furnish the disputed information and in unilaterally implementing its final offer. Accordingly, we grant Lakeland's petition for review and deny the Board's cross-application for enforcement.

## I. BACKGROUND

The Board found that the relevant facts are not in dispute. *See Lakeland Bus Lines, Inc.*, 335 N.L.R.B. 322, 322 (2001) ("*Order*"). We will briefly summarize the facts before turning to the issues presented by the petition for review.

Petitioner Lakeland operates a commuter bus service between western New Jersey and New York City. The Company has had a collective-bargaining relationship with the Union for more than 20 years. With a collective bargaining agreement set to expire in January 1997, Lakeland and the Union commenced negotiations for a new agreement in November 1996. The parties held 11 bargaining sessions. Lakeland's bargaining position during these negotiations was heavily influenced by the recent institution of a commuter rail service by the State of New Jersey that overlapped some of the routes operated by Lakeland. As a consequence of this new competition, Lakeland faced significant losses in ridership and revenue.

In light of these claimed losses, the Company requested several concessions from the Union in the new contract.

Negotiations focused in particular on Lakeland's request for an extended wage freeze and for a modification of the Company's rules regarding "spread time," which determined the availability of overtime pay for bus drivers. Lakeland repeatedly stated that it needed these concessions because of the revenue losses it had incurred as a result of the new rail service. On February 21, 1997, the parties met for what proved to be their final bargaining session. Lakeland proposed a one-time payment of $500 per employee in exchange for the Union's acceptance of its proposals. The Union would not agree to the modification of the spread time rules and the parties failed to reach an agreement.

On February 25, 1997, Lakeland submitted its final offer to the Union. The offer included the wage freeze, the new spread time rules, and the $500 bonus payment. In addition, the president of the Company sent a letter to bargaining unit employees urging their acceptance of the final offer. The letter stated in relevant part:

> [A]s you know, we have lost 7500 riders per week to New Jersey Transit Rail. However, we are attempting to do it with minimal impact on each of the members of our family, i.e., YOU.
>
> . . . .
>
> [As] those of you who have been around for a while know, I am not one to "cry wolf." I believe in being honest, and that is just what I am trying to do. Simply stated, we are trying to bring the bottom line back into the black and we are doing this by increasing charters, reducing liability insurance costs and negotiating with NJT for additional lines to utilize our manpower and equipment.
>
> We are simply all doing what must be done, and now, we are asking for help from our LAKELAND FAMILY so we may retain your jobs and get back in the black in the short term and continue to share our good fortune as we have in the past.

> Therefore, I ask you to give the enclosed Final Offer your serious consideration and vote YES to ratify it. The future of Lakeland depends on it.

Letter from Lakeland President to Lakeland Employees (Feb. 25, 1997), *quoted in Order*, 335 N.L.R.B. at 322 (alterations in original). The next day, Union attorney John Craner wrote a letter to Lakeland attorney Desmond Massey expressing confusion over the Company's position and requesting that the Company verify its claims by providing financial information to the Union. The letter stated:

> The Union is having a great deal of difficulty in understanding the position of the company. On the one hand it talks about its financial woes and looks for all types of give-backs and at the same time offers the employees a $500 bonus amounting to approximately $40,000. To the Union, none of this makes sense. And, the reason it doesn't make sense is because the Union has been accepting the representations of the Company as to the extent of the losses it claims are due to the loss of passengers as a result of the rail line which now competes with Lakeland on its 24 lines.
>
> Accordingly, since the [spread time issue] seems so critical and the company contends it is sustaining substantial losses, the Union now feels it is imperative to ascertain the extent of this loss, if any and wants to have its accountant inspect the company books and records before any further negotiations take place or any "final offers" are put on the table.

Letter from Craner to Massey (Feb. 26, 1997), *quoted in Order*, 335 N.L.R.B. at 334. In response, Massey denied that the Company had any obligation to disclose the requested financial information. And, in an effort "[t]o set the record straight," Massey made it expressly clear

> that the Company was losing money, not that the company's financial condition precluded it from agreeing to the Union wage proposal. No claim of

> financial inability, explicit or implicit, was made by myself or any company official.

Letter from Massey to Craner (Mar. 11, 1997), *quoted in Order*, 335 N.L.R.B. at 334. Craner and Massey subsequently exchanged another set of letters to similar effect. Massey again reiterated that "[a]t no time did I or any Company official claim a present inability to pay or a prospective inability to pay during the life of the contract being negotiated." Letter from Massey to Craner (Mar. 27, 1997), *quoted in Order*, 335 N.L.R.B. at 335.

On March 28, 1997, following the employees' rejection of the Company's final offer, Lakeland unilaterally implemented the terms of its final offer. This included the modification of the spread time rules and the $500 per employee payment. *See Order*, 335 N.L.R.B. at 335. In October 1997, the bargaining unit employees went on strike. During the strike, the Union distributed a leaflet to customers apologizing for any inconvenience associated with the work stoppage. The Union's leaflet also stated that,

> [w]hen [the Union] requested an audit of their books, Lakeland refused, admitting that they were not, in fact, under any hardship from a loss of revenue, but instead, chose not to offer any increases in wages.

*See* Union Leaflet to Customers (Oct. 28, 1997), *quoted in Order*, 335 N.L.R.B. at 335.

The Union filed charges with the Board on March 27, 1997, contending that Lakeland had violated the NLRA by refusing to supply the requested financial information and by failing to bargain in good faith. On May 26, 1998, NLRB General Counsel issued a complaint. The General Counsel charged Lakeland with violating § 8(a)(1) and (5) of the Act by refusing to disclose its financial information or to bargain in good faith. The General Counsel also charged that this refusal had precluded the parties from reaching a valid impasse in negotiations, so that Lakeland's unilateral implementation of its final offer also violated the Act.

In proceedings before the ALJ, the General Counsel conceded that Lakeland had never *expressly* claimed an inability to pay. Rather, the General Counsel argued that the Company's statements during the course of bargaining amounted to an implicit claim. *See Order*, 335 N.L.R.B. at 332. The General Counsel further conceded – and the Board does not dispute – that "but for the alleged refusal to furnish information, a valid impasse was reached and therefore the Company would have been within its rights in implementing its last offer." *See id.*

The ALJ dismissed the complaint. In the ALJ's view, Lakeland's disputed assertions during bargaining related solely to loss of revenue and ridership, not an inability to pay. The ALJ held that such assertions did not trigger any duty to disclose the requested financial information. The ALJ further found that even if Lakeland had implicitly asserted an inability to pay, Massey's exchange of letters with Craner retracted the claim and discharged any obligation the Company may have incurred. *See id.* at 338.

The Board rejected the ALJ's conclusions and found that Lakeland had violated the Act by failing to produce the financial information. The Board relied almost exclusively upon the February 25 letter from the Company's President to bargaining unit employees urging the adoption of the final offer. In particular, the Board found that the President's statements that the Company was "trying to bring the bottom line back into the black," that acceptance of the final offer would enable the Company to "retain [employee] jobs and get back in the black in the short term," and that the "future of Lakeland depends on" acceptance of the final offer conveyed an inability to pay. *Id.* at 324-25. The Board further concluded that Lakeland had not effectively retracted this claim. Massey's statements, the Board reasoned, constituted a denial that the Company was claiming an inability to pay. According to the Board, an effective retraction would first require acknowledgment of the claim to be retracted. Consequently, a denial logically could not accomplish a retraction. *See id.* at 326. Accordingly, the Board found that Lakeland had unlawfully refused to furnish its financial information.

This refusal to bargain prevented the parties from reaching a valid impasse. Absent a valid impasse, Lakeland's unilateral implementation of its final offer also violated the Act. *See id.* Lakeland filed this petition for review, and the Board cross-petitioned for enforcement of its decision.

## II. ANALYSIS

Sections 8(a)(5) and 8(d) of the NLRA make it an unfair labor practice for an employer to refuse to bargain collectively and in good faith with the representatives of its employees. *See* 29 U.S.C. § 158(a)(5), (d) (1998). This obligation to bargain in good faith requires that employers and unions exchange relevant information when necessary to substantiate assertions made during collective bargaining. *See NLRB v. Truitt Mfg. Co.*, 351 U.S. 149, 152-53 (1956). In *Truitt*, the Supreme Court held that when an employer bases its bargaining position on an asserted inability to pay, information about the employer's finances becomes relevant to the negotiations. *See id.* In this situation, a union may be entitled to examine the company's books in order to verify the claim. *See id.* at 153. A company that asserts an inability to pay and then refuses to furnish substantiating financial information upon request from a union fails to bargain in good faith. *See id.*; *see also ConAgra, Inc. v. NLRB*, 117 F.3d 1435, 1438-39 (D.C. Cir. 1997). *Truitt* emphasized, however, that it does not automatically follow that a union is entitled to substantiating evidence in every case in which economic inability is raised as an argument against increased wages. *Truitt*, 351 U.S. at 153. Rather, "[e]ach case must turn upon its particular facts." *Id.*

In *ConAgra*, we recognized that the Board's application of *Truitt*'s mandate has been evolving. 117 F.3d at 1439-42. Prior to 1991, the Board construed *Truitt* to oblige an employer to provide financial information to a union upon request even when the employer asserted only a "competitive disadvantage." *Id.* at 1439. In *Nielsen Lithographing Co.*, the Board changed its course and ruled that a claim of competitive disadvantage is not the same as a claim of

financial inability to pay. 305 N.L.R.B. 697, 699 (1991), *aff'd sub nom. Graphic Communications Int'l Union v. NLRB*, 977 F.2d 1168 (7th Cir. 1992). Subsequent decisions, both from the Board and this court, have emphasized a distinction between asserting an inability to pay, which triggers the duty to disclose, and asserting a mere unwillingness to pay, which does not. *See, e.g.*, *United Steelworkers v. NLRB*, 983 F.2d 240, 244 (D.C. Cir. 1993); *Beverly Cal. Corp.*, 310 N.L.R.B. 222, 226-27 (1993), *enforced in part*, *Torrington Extend-A-Care Employee Ass'n v. NLRB*, 17 F.3d 580 (2d Cir. 1994).

Even where an employer's statements suggest an inability to pay, no duty to disclose arises if that employer clarifies that it did not intend to plead financial inability. *See Fairhaven Props., Inc.*, 314 N.L.R.B. 763, 769 (1994). This rule cogently reflects the rationale underlying the *Truitt* obligation to disclose financial information. A refusal to disclose, the Supreme Court noted, could amount to a failure to bargain in good faith where "an employer mechanically repeats a claim of inability to pay without making the slightest effort to substantiate the claim." *Truitt*, 351 U.S. at 153. In this same vein, the Board has made it clear that a mere disclaimer of an asserted inability to pay is not dispositive. *Shell Co.*, 313 N.L.R.B. 133, 134 n.7 (1993). However, if an employer obliquely, unintentionally, or momentarily implies an inability to pay, the failure to substantiate this claim is not bad faith where the balance of the employer's representations disavow any such claim. *Cf. Truitt*, 351 U.S. at 153-54 ("The inquiry must always be whether or not under the circumstances of the particular case the statutory obligation to bargain in good faith has been met.").

In this case, the Board determined that certain phrases in the employer's February 25 letter to bargaining unit employees implied that the concessions the Company demanded from the Union were necessitated by the Company's inability to pay. The Board further concluded that Lakeland never effectively retracted this claim. In its petition for review to this court, Lakeland's principal claim is that the Board's decision is not supported by substantial evidence. We will now turn to this claim.

"A reviewing court sets aside decisions of the Board only when the Board has acted arbitrarily or otherwise erred in applying established law to the facts, or when its findings of fact are not supported by 'substantial evidence' in the record considered as a whole." *ConAgra*, 117 F.3d at 1438. Normally, we will reverse a Board decision for lack of substantial evidence "only when the record is 'so compelling that no reasonable factfinder could fail to find' to the contrary." *United Steelworkers*, 983 F.2d at 244 (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 484 (1992)). As the Supreme Court has explained, however, "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951). Accordingly, we may not find substantial evidence "merely on the basis of evidence which in and of itself justified [the Board's decision], without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn." *Id.* at 487.

Applying these principles, it is clear that the Board's decision in this case fails to take account of contradictory evidence and is not supported on the record as a whole. The Board based its decision on three statements in the employer's February 25 letter. In that letter, Lakeland's President "stated that [the Company] was 'trying to bring the bottom line back into the black,' that acceptance of the final offer would enable [Lakeland] to 'retain your jobs and get back in the black in the short term,' and that '[t]he future of Lakeland depends on it.' " *Order*, 335 N.L.R.B. at 324-25. Analogizing to a previous holding that statements that a company's business condition was "bad" and "a matter of survival" implicitly asserted an inability to pay, the Board concluded that Lakeland's statements "reasonably conveyed a present inability to pay." *Id.* at 325 (citing *Shell Co.*, 313 N.L.R.B. 133 (1993)).

It is debatable whether these three statements, viewed in isolation, imply an inability to pay, as opposed to a mere unwillingness to pay. When considered in light of the record as a whole, however, it is absolutely clear that the statements do not provide a sufficient basis for the Board's decision.

The Board purports to consider the letter "in context." *Order*, 335 N.L.R.B. at 325, 326. Indeed, its own precedents require that it do so. *See, e.g.*, *Burruss Transfer, Inc.*, 307 N.L.R.B. 226, 228 (1992) (holding that an employer's statement that he did not "feel that he could afford" the union's proposals did not trigger a duty to disclose because "the overall context of bargaining" did not suggest an inability to pay). Nevertheless, the Board decision focuses principally on the February 25 letter to support its conclusion.

The Board also references Lakeland's "repeated assertions during negotiations about its loss of ridership and revenue." *Order*, 335 N.L.R.B. at 326. But these assertions involve nothing more than claims of short-term business losses. The Board and courts have distinguished between claims of business losses and competitive disadvantage versus claims that the employer *cannot pay*. *See, e.g.*, *ConAgra*, 117 F.3d at 1443; *Beverly Cal. Corp.*, 310 N.L.R.B. at 227. As the Board noted in *Nielsen*:

> The employer who claims a present inability to pay, or a prospective inability to pay during the life of the contract being negotiated, is claiming essentially that it cannot pay. By contrast, the employer who claims only economic difficulties or business losses or the prospect of layoffs is simply saying that it does not want to pay.

*Nielsen*, 305 N.L.R.B. at 700. Thus, the case law makes it clear that claims regarding business losses are not equivalent to claims of inability to pay and they alone do not trigger the *Truitt* obligation to substantiate an asserted inability to pay. *See, e.g.*, *Stroehmann Bakeries, Inc. v. NLRB*, 95 F.3d 218, 222 (2d Cir. 1996) ("[W]here an employer claims only general economic difficulties or business losses as the reason for its position, the employer may lawfully refuse to hand over financial information.").

The Board's only other reference to "context" relates to statements that Lakeland failed to make regarding its continued profitability. *See Order*, 335 N.L.R.B. at 325-26. Obviously, if a company asserts that it is profitable, this may serve

to negate any suggestion that the company has asserted an inability to pay. *See ConAgra*, 117 F.3d at 1443. Therefore, it is hardly surprising that the Board has found assertions of profitability relevant in cases of this sort. *See Nielsen*, 305 N.L.R.B. at 700-01. However, the Board has never held that the absence of evidence on profitability is determinative.

In this case, during collective bargaining negotiations, the Company claimed only short-term business losses, not an inability to pay. Then, in the February 25 letter, an issue arose as to whether the Company had asserted an inability to pay by stating that it needed to get "back in the black in the short term." But the Company quickly defused any confusion over this matter by explicitly disclaiming any intention to assert an inability to pay. In this context, the Company's failure to positively assert that it was profitable cannot be determinative.

Rather than the clipped view of the record it chose to take, the Board should have fully considered the entire course of negotiations in determining whether the Company was truly pleading an inability to pay. For example, when the Union initially requested that the Company turn over its books, Lakeland's attorney responded: "[T]o set the record straight, I advised that the Company was losing money, not that the company's financial condition precluded it from agreeing to the Union wage proposal. No claim of financial inability, explicit or implicit, was made by myself or any company official." Letter from Massey to Craner (Mar. 11, 1997), *quoted in Order*, 335 N.L.R.B. at 334. And when the Union persisted in requesting the information, Lakeland's attorney again wrote that "[a]t no time did I or any Company official claim a present inability to pay or a prospective inability to pay during the life of the contract being negotiated." Letter from Massey to Craner (Mar. 27, 1997), *quoted in Order*, 335 N.L.R.B. at 335.

In view of these clarifying statements, the Board could not plausibly conclude that Lakeland asserted an inability to pay. *See Georgia-Pacific Corp.*, 305 N.L.R.B. 112, 116 (1991) (holding that a subsequent letter made it "clear that Respondent

[was] not pleading poverty or an inability to retain the contractual 'status quo,' simply an unwillingness to continue to pay fringe benefits or wages that would make competition more difficult"). Indeed, the Union understood as much. In the leaflet distributed to Lakeland customers during the October 1997 strike, the Union related details of the bargaining process and the Union's request for financial information. In the Union's view, after Lakeland refused to disclose the requested material, the Company "admitt[ed] that they were not, in fact, under any hardship from a loss of revenue, but instead, *chose* not to offer any increases in wages." Union Leaflet to Customers (Oct. 28, 1997), *quoted in Order*, 335 N.L.R.B. at 335 (emphasis added). Despite the inferences the Board attempts to extract from the February 25 letter, the record as a whole shows that Lakeland simply did not rest its bargaining position on an inability to pay. Accordingly, no *Truitt* obligation to disclose financial information arose.

In its decision, the Board opted to split its inquiry into two steps, asking first whether it could discern any statements from the employer that triggered a duty to disclose. Having concluded that the February 25 letter, coupled with repeated claims during negotiations about loss of ridership and revenue, asserted an inability to pay, the Board then considered whether any subsequent statement from the employer adequately retracted the initial claim such that the obligation to produce financial information was discharged. A similar approach was followed in *Fairhaven Properties*. *See* 314 N.L.R.B. at 769. Even adopting this approach, the Board's decision is not supported by substantial evidence. As noted above, in the exchange of letters between Company and Union counsel, Lakeland repeatedly stated that at no time had it claimed an inability to pay. These statements indisputably disavowed any contrary impression Lakeland's statements during bargaining and in the February 25 letter might have left regarding the Company's position. The Board ruled otherwise, reasoning that, by definition, one could not "retract" a statement without first acknowledging having made it. The letters from Lakeland's attorney denied making the assertion and therefore, in the Board's view, logically could

not have constituted a retraction. *See Order*, 335 N.L.R.B. at 326. This argument is unavailing. Lakeland responded precisely to the Union's request for financial information by making it unmistakably clear that it did not rely on an inability to pay to justify its bargaining position. There is nothing in the Board's order or the ALJ's findings to suggest that these disavowals were made disingenuously or in bad faith. *Cf. Shell Co.*, 313 N.L.R.B. at 134 n.7, 138 (finding that an express retraction was not dispositive where the company "was playing semantical games"). The record therefore does not support the Board's conclusion.

Because Lakeland did not assert an inability to pay, it incurred no obligation to disclose the requested financial information. Its refusal to do so therefore did not constitute a refusal to bargain. The finding that the parties had otherwise reached an impasse thus stands unrefuted. *See Order*, 335 N.L.R.B. at 332. The Company therefore did not violate the Act by unilaterally implementing the terms of its final offer. *See Am. Fed'n of Television & Radio Artists v. NLRB*, 395 F.2d 622, 624 (D.C. Cir. 1968).

### III.  CONCLUSION

We grant the Company's petition for review and deny the Board's cross-application for enforcement.