KAREN LeCRAFT HENDERSON, Circuit Judge,
dissenting in part:
I respectfully dissent from Parts II and III of the majority opinion because, in my view, KLB Industries’ (KLB) generalized statements regarding competitiveness did not give rise to a duty of further disclosure to the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW (Union), nor did KLB unlawfully impose the subsequent lock out of its bargaining unit employees.
I.
KLB produces aluminum extrusions at its Bellefontaine, Ohio facility. KLB began negotiating with the Union for a new collective bargaining agreement (CBA) in September 2007.[1] KLB sought wage cuts and other concessions in order to improve its competitive position. On October 3, the parties met "with a federal mediator. After KLB told the mediator that its current offer was its “last, best and final offer,” the mediator stated “I guess we’re at impasse then,” to which the Union’s representative demurred. KLB Indus., Inc., 357 NLRB No. 8, at *24 (July 26, 2011). The next day, the Union sent KLB a letter requesting, among other things, information on KLB’s proposal for “wage reductions.” The Union wrote:
During the course of these negotiations, the Company has continually asserted that they [sic] must improve the competitive position of the Bellefontaine, Ohio facility. Based on this assertion, the Company has made numerous contract *561 proposals that reduce the wages and benefits. In order for the Union to determine the veracity of these claims, please provide the following information:
1. A list of all current customers so that the Union may contact the customers to determine if any of them is contemplating purchasing products from other sources.
2. A copy of any and all quotes that the Company has provided, and whom these quotes have been issued to. Also, how many quotes have been awarded (or not awarded) in the past five (5) years.
3. Identify any and all outsourced work (in the past 5 years) that had previously been done at this facility by the bargaining unit employees.[2]
4. A list of all customers who have ceased buying from this facility during the last 5 years. The union needs this information to test the Company’s assertion that they [sic] are not competitive. The union intends on contacting the former customers to learn the reasons why they stopped purchasing.
5. A complete list of prices for products so that the union can compare the prices of competitors.
6. In order for the Union to determine whether the company’s assertion of uncompetitivness [sic] is based on price or other factors. Please provide market studies and/or marketing plans that would impact sales of products produced at of [sic] the KLB Industries, Bellefontaine, Ohio facility.
Deferred Appendix (DA) 357-58 (hereinafter referred to as “Competitive Information”). The Union also requested “a complete calculation of the projected company savings over the next three years, including any projected overtime” resulting from KLB’s wage proposal. DA 358. The parties continued to negotiate but KLB did not provide the Competitive Information to the Union. On October 18, KLB wrote to the Union, explaining that the Competitive Information was irrelevant:
The Company disagrees that information you requested about its current customers is necessary and relevant.... The Company’s desire to remain competitive in both global and domestic markets is no different from the desire of any business conducting operations similar to those of KLB.... [T]he UAW’s bare assertion that it needs to test the veracity of KLB’s “claim” of competitiveness is insufficient to make customer information necessary and relevant to the Union’s role as the exclusive representative of the bargaining unit.
The Company also disagrees that information about outsourced work is necessary and relevant to the UAW’s representation of the bargaining unit. The UAW is well aware that KLB has, and continues to, outsource work. To KLB’s knowledge, the Union has never complained about or grieved outsourcing. Further, the Company and the Union have not had any bargaining discussions related to outsourcing. The Company fails to understand how its broad statement of remaining competitive in global *562 and domestic markets triggers the necessity and relevancy of outsourcing information.
The Company, however, agrees that the wage cost saving is necessary and relevant. The first year saving[s] is $36,177.00. The second year savings is $44,498.00. The third year savings $62,652.00 [sic]. And the overall cost savings of the proposed wage decrease is $133,327.00.
DA 387. Three days later, the Union responded. Rather than explaining the relevance of its request for the Competitive Information, it simply repeated:
The Union maintains that it is entitled to all documents and information called for in our October 4, 2007 letter and, again, the Company has failed miserable [sic] to supply essential information regarding the Company’s proposals to [sic] wage reductions to the Union.
DA 393. The Union also complained that the wage cost savings information did not include “complete calculations.” DA 393. On October 19, KLB told the Union representative that a lockout would commence on October 22. KLB also sent letters to bargaining unit employees stating that insurance benefits would terminate on October 23 and that they should apply for continuation coverage, if desired, under the Consolidated Omnibus Budget Reconciliation Act of 1985, 29 U.S.C. §§ 1161 et seq. (COBRA). On October 22, KLB locked out the bargaining unit employees and began hiring temporary replacements. On October 24, KLB notified United Healthcare, its insurance provider, to cancel its group insurance policy. Unbeknownst to KLB, the cancellation meant that bargaining unit employees were not eligible for the COBRA continuation coverage. While the parties met thereafter on three other occasions, they did not come to an agreement on a new CBA.
Ultimately, the Union filed unfair labor practice charges[3] against KLB. After a hearing before an administrative law judge (ALJ), the ALJ found that KLB had violated the NLRA by (1) failing to provide relevant information to the Union; and (2) locking out employees, hiring temporary replacements and cancelling health insurance.[4] On July 26, 2011, the Board affirmed the ALJ’s decision and reasoning in full, with Member Hayes dissenting on the grounds that KLB was under no obligation to provide the Competitive Information to the Union and that the loekout/hiring of temporary replacements was lawful. The Board found, inter alia, that KLB had violated section 8(a)(5) and (1) of the Act by failing to provide the Union relevant information and section 8(a)(5), (3) and (1) by locking out employees, hiring temporary replacements and cancelling its employees’ health insurance coverage.
II.
Applying clear precedent, I believe the Board incorrectly concluded that KLB violated section 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) & (5) (NLRA or Act), by declining to produce the Competitive Information. Under section 8(a)(5), the employer has a “duty to bargain collectively,” Detroit Edi *563 son Co. v. NLRB, 440 U.S. 301, 303, 99 S.Ct. 1123, 59 L.Ed.2d 333 (1979), which requires it to provide relevant information to the union when requested. See N.Y. & Presbyterian Hosp. v. NLRB, 649 F.3d 723, 729 (D.C.Cir.2011). Information about bargaining unit terms and conditions of employment is presumptively relevant. See id. at 730. But where, as here, the union requests information regarding a different matter, it has the burden to “explain to the employer why the information is relevant.” Id. The “threshold for relevance” is a “discovery-type standard,” meaning “ ‘[t]he fact that the information is of probable or potential relevance is sufficient to give rise to an obligation ... to provide it.’ ” Id. (quoting Oil, Chem. & Atomic Workers Local Union No. 6-418 v. NLRB, 711 F.2d 348, 359 (D.C.Cir.1983)) (internal quotation mark omitted and alterations in original). In determining whether the union has satisfied its burden to show relevance, we have held that “ ‘context is everything,’ ” and, most important here, “we consider the reasons [for relevance] proffered by the union at the time of its request.” Id. at 731 (quoting U.S. Testing Co. v. NLRB, 160 F.3d 14, 19 (D.C.Cir.1998)).
While the “threshold for relevance” is low, it is not zero. “ ‘A union’s bare assertion that it needs information ... does not automatically oblige the employer to supply all the information in the manner requested.’ ” Id. at 730 (quoting Detroit Edison, 440 U.S. at 314, 99 S.Ct. 1123) (ellipses in original). An employer must supply information to substantiate specific assertions on which it premises its bargaining positions because the information is necessary to the Union to “evaluate and verify the [employer’s] assertions and develop its own bargaining positions.” Caldwell Mfg. Co., 346 NLRB 1159, 1160 (2006); see also Lakeland Bus Lines v. NLRB, 347 F.3d 955, 960 (D.C.Cir.2003) (“Th[e] obligation to bargain in good faith requires that employers and unions exchange relevant information when necessary to substantiate assertions made during collective bargaining.”) (emphases added). At the same time, the employer has no obligation to disclose information merely because it makes a generalized statement during negotiations. See F.A. Bartlett Tree Expert Co., 316 NLRB 1312, 1313 (1995) (employer’s reference to fact that customer contracts varied did not obligate employer to furnish contracts to union for examination).
An employer must provide general financial information to a union if the employer predicates its bargaining position on an “inability to pay.” See NLRB v. Truitt Mfg. Co., 351 U.S. 149, 152-53, 76 S.Ct. 753, 100 L.Ed. 1027 (1956). For a time, the Board also applied this formulation to an employer that asserted competitive disadvantage, treating the assertion as the equivalent of an inability to pay claim. ConAgra, Inc. v. NLRB, 117 F.3d 1435, 1439 (D.C.Cir.1997). As discussed in Con-Agra, however, the Seventh Circuit first registered its disagreement with the Board’s formulation in 1986. In NLRB v. Harvstone Mfg. Corp., 785 F.2d 570 (7th Cir.1986), that Circuit declared that claims of competitive disadvantage are “nothing more than truisms” and do not equate to an inability to pay. Id. at 576-77. Instead, a competitive disadvantage claim manifests only that the employer is not willing to pay — which, unlike an inability-to-pay claim, is not a verifiable assertion— and consequently does not require substantiation. See id. at 577 (“[T]he employer operating at a competitive disadvantage is financially able, although perhaps unwilling, to pay increased wages.”); see also Lakeland Bus Lines, 347 F.3d at 961 (“a mere unwillingness to pay ... does not [trigger a duty to disclose]”); United *564 Steelworkers of Am., Local Union 14534 v. NLRB, 983 F.2d 240, 244 (D.C.Cir.1993) (“A company is obliged to provide financial information only when it asserts an inability to pay, because this assertion is legitimately subject to verification.”). The Board eventually agreed, concluding in Nielsen Lithographing Co. that a “claim of competitive disadvantage is not the same as a claim of financial inability to pay” and therefore does “not trigger an obligation to furnish financial information under Truitt.” 305 NLRB 697, 699, 701 (1991).
“We review the Board’s factual conclusions for substantial evidence” and “uphold the Board’s application of law to facts unless arbitrary or otherwise erroneous.” N.Y. & Presbyterian Hosp., 649 F.3d at 729 (quoting Guard Publ’g. Co. v. NLRB, 571 F.3d 53, 58 (D.C.Cir.2009)) (internal quotation marks omitted). Here, however, the Board wholly failed the substantial evidence test. It concluded that KLB made “grave, specific, and recurring” representations about competitiveness, which “encompassed not only the source of competitive difficulties (rising production costs and falling production), but the day-to-day impact of those constraints on the company’s business, including its difficulty in retaining customers and in paying employees in line with previous contracts.” KLB Indus., Inc., 357 NLRB No. 8, at *4. The Board also declared that KLB had “explicit concerns about retaining customers and keeping pace with Asian competitors” and that KLB’s concerns were communicated “not only at the hearing, but during negotiations as well.” Id. n. 9 (emphasis added). Unless I have read a different version of the Board decision, the Board nowhere pointed to any evidence that matches its overblown description of KLB’s negotiating posture.[5]
Simply put, the record does not support the Board’s characterization of the parties’ bargaining. As Member Hayes explained in dissent, the only record evidence regarding KLB’s “elaboration” of its competitive disadvantage assertion is as follows:
Q. (on direct examination) Did KLB say anything to the Union regarding why it wanted to achieve cost savings in this Collective Bargaining Agreement in 2007?
A. We indicated to them that we, you know, wanted to be — stay competitive and we were competing with the Asian firms.
And also that our costs per hour, per production hour had risen and our — our production, itself, had actually dropped a little.
Q. Okay. And did KLB, during the 2007 negotiations, did KLB tell the Union about the — the top 20 information [about customers] that we just discussed with the Court?
A. No, we did not.
DA 167:10-23 (Testimony of KLB Negotiator Bryan Hastings) (emphasis added).
Q. (on direct examination) Do — do you — did the Employer offer any explanation at this point as to why they needed all of these wage cuts?
A. They always only referred to competitiveness.
Q. Okay. And — and who is that, that you say that’s speaking?
A. I would say Brian [sic],
Q. So when you say referred to competitiveness so that the Employer could be competitive?
*565 A. Yes.
DA 47:4-8 (Testimony of Union Negotiator Konrad Young) (emphasis added).
Q. (on cross-examination) With respect to explaining why the Company wanted concessions, isn’t it true that Mr. Hastings said more that [sic] just they needed to be competitive?
A. I don’t recollect anything other than competition with other Companies ivithout them naming the Companies and, it all centered around competitiveness.
Q. Okay. Did Mr., Mr. Wakefield told [sic] you that the Company’s production cost was decreasing, isn’t that true?
A. Competitive, yes, that’s competitiveness.
Q. All right. And Mr. Wakefield also told you that the productivity of the Company’s employees was decreasing, isn’t that correct?
A. I don’t recall that.
DA 76 at Tr. 369:24-370:13 (Testimony of Union Negotiator Konrad Young) (emphasis added). The record shows, at best, two substantiatable “competitiveness” statements: Hastings’s statement about a rise in “production cost[s]” and Hastings’s statement about decreased productivity. But the Union did not specify any “production costs” or “productivity” information in the lengthy list of Competitive Information it did seek. Additionally, KLB’s statement regarding competition from “Asian firms” was generic. Hastings did not name specific competitors — he simply mentioned “Asian firms,” common competitors of nearly all American manufacturers.
Additionally, the generality of the Union’s Competitive Information request manifests that KLB in fact made only a generic competitive disadvantage claim in that both the Union’s initial request of October 4 as well as its October 21 followup letter failed to refer to even a single “competitiveness” claim made by KLB during negotiations. ^Despite having the burden to explain the relevance of the Competitive Information it sought at the time it sought that information, see N.Y. & Presbyterian Hosp., 649 F.3d at 731, the Union merely stated that it wanted the Competitive Information to establish the “veracity” of KLB’s competitive disadvantage claim. This is plainly insufficient to establish relevance. Cf. F.A. Bartlett Tree Expert Co., 316 NLRB at 1313 (“The basis for the request, i.e., that the information contained in the [customer] contracts is necessary to make a reasonable wage proposal is nothing more than another way of saying that it is needed ‘to bargain intelligently’ and this general claim is simply insufficient to establish relevance.”). Moreover, after KLB replied that the Competitive Information was irrelevant, see DA 387, the Union reasserted with no elaboration that it was entitled to the Competitive Information and chastised KLB for failing “miserabl[y] to supply” the information. DA 393.
The majority gives several reasons why it believes “substantial record evidence supports the ALJ’s finding that the issues raised at the administrative hearing were the same issues discussed at the bargaining table.” Maj. Op. 558. But the only record evidence it cites is Hastings’s admission that he made a generic competitive disadvantage claim during bargaining. I do not see how it follows from this that KLB made the required specific claims during bargaining. The majority also cites the Board’s statement that KLB “ ‘communicated [its] concerns not only at the hearing, but during negotiations as well’ ” and that the ALJ stated that KLB explained its competitive disadvantage claim “ ‘in a variety of ways’ ” and that KLB’s rationale for wage cuts “ ‘centered around competitiveness.’ ” Maj. Op. 553, 558 (quoting KLB *566 Indus., Inc., 357 NLRB No. 8, at *4 n. 9, *50). But these statements are not supported by any record evidence.[6] The majority fails to address the key weakness of the Board’s order: that it is not supported by substantial evidence.
The majority compares the specificity of KLB’s competitiveness claim to that of the employer in Caldwell. But in Caldwell, the employer specified that: (1) its Rochester plant was less competitive than its other plants; (2) that plant had already experienced significant reductions in force; (3) its production costs were lower elsewhere; and (4) without bargaining concessions, the Rochester plant would not be “a viable option when it came time to locate contemplated new product lines.” 346 NLRB at 1160 & n. 6. And, in response to the employer’s detailed assertions, the union “requested specific information to evaluate the accuracy of the [employer’s] specific claims.” Id. at 1160 (emphases added); see also id. at 1159 & n. 3, 1160 n. 6. KLB’s bargaining position — which generieally referred to production costs, productivity and “competing with the Asian firms” — is a far cry from the employer’s position in Caldwell — even more so because the Union failed to request any information regarding production costs and productivity.
The majority divides the duty to disclose non-presumptively-relevant information (i.e., information that does not relate to bargaining unit terms and conditions of employment) into two distinct “lines of cases.” Maj. Op. 555. The “discovery” line of cases stands for the proposition that the employer must turn over all requested information that is relevant to the union, with relevance being “ ‘broadly construed.’ ” Maj. Op. 556 (quoting U.S. Testing Co., 160 F.3d at 19); see also supra pp. 562-63 (discussing N.Y. & Presbyterian Hosp., 649 F.3d at 730, as requiring information to be only “of probable or potential relevance”). On the other hand, the “Nielsen ” line is more specific — it requires the employer to “ ‘open its books’ to the union if it ‘pleads poverty’ or raises an ‘inability to pay’ defense during ... negotiations,” Maj. Op. 555-56, but not if the employer claims competitive disadvantage. See Lakeland Bus Lines, 347 F.3d at 961. The majority contends that this case belongs in the broad discovery line. I disagree.
The Nielsen line of cases is not wholly analytically distinct from the discovery line; rather, the Nielsen line is a specific line of authority that branches. from the discovery precedent. Under Nielsen, the reason the employer’s books become relevant when it pleads poverty is that an examination of the books can verify if the employer’s assertion is true. United Steelworkers, 983 F.2d at 244 (emphasis added) (“A company is obliged to provide financial information only when it asserts an inability to pay, because this assertion is legitimately subject to verification.”) (emphasis added). But the Nielsen line also explains that the employer’s assertion of competitive disadvantage (as opposed to a poverty plea) does not create a broad disclosure obligation because the assertion is not “legitimately subject to verification.” See id.; Lakeland Bus Lines, 347 F.3d at 961. Just as in the analogous area of statutory construction, where the specific *567 controls the general, Gozlon-Peretz v. United States, 498 U.S. 395, 407, 111 S.Ct. 840, 112 L.Ed.2d 919 (1991) (“A specific provision controls over one of more general application”), the employer asserting competitive disadvantage represents a “carve out” from the otherwise applicable broad discovery cases.
My colleagues conclude that “KLB has pursued an all-or-nothing litigation strategy to disclosure” and “critically for our purposes, the company does not argue here that even if it had a disclosure obligation, the union’s information request was irrelevant.” Maj. Op. 559. I disagree; KLB did not pursue an all-or-nothing disclosure strategy, either during bargaining or litigation. In response to the Union’s October 4 Competitive Information request, KLB in fact provided information it agreed was relevant. See DA 387 (providing bonus proposal information and wage cost savings information). Presumably KLB would have provided further information had the Union fulfilled its burden to explain the information’s relevance. N.Y. & Presbyterian Hosp., 649 F.3d at 731.[7] Nor does KLB take the position today that it had no obligation to disclose any information contained in the October 4 request only because it did not make a plea of poverty; rather, KLB also asserts that it did not have an obligation to disclose irrelevant information.
Although broad, the relevance standard is not meaningless. Nothing in the record of the parties’ negotiations demonstrates that KLB made anything other than a generic competitive disadvantage claim; a mere “truism” indicating an unwillingness to pay. Likewise, nothing manifests that the Union met its burden by demonstrating the relevance of the Competitive Information at the time it sought that information.[8]
III.
I also believe that KLB’s lockout, hiring of temporary replacements and cancellation of health insurance did not violate sections 8(a)(5), (3) and (1) of the Act.
A bargaining lockout is lawful if it is initiated for the “sole purpose of bringing economic pressure to bear in support of [an employer’s] legitimate bargaining position.” Am. Ship Bldg. Co. v. NLRB, 380 U.S. 300, 318, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965). On the other hand, an employer may not lock out employees “for the purpose of evading its duty to negotiate with the employees’ bargaining representative.” Teamsters Local Union No. 639 v. NLRB, 924 F.2d 1078, 1085 (D.C.Cir.1991). But “the mere fact of an unremedied Section 8(a)(5) failure to furnish information does not necessarily compel a finding that a *568 subsequent lockout was unlawful.” PACCAR, Inc. d/b/a Peterbilt Motors Co., 357 NLRB No. 13, 2011 WL 2784214, at *4 (2011) (emphasis in original). Rather, “[ajlthough nowhere expressly stated, the standard consistently, if implicitly, applied by the Board is that where the unlawful withholding of the information did not materially affect the progress of negotiations, the ... lockout is lawful notwithstanding the unremedied violation.” Id. (emphasis added). While Peterbilt Motors involved a posi-lockout refusal to furnish requested information, the Board there noted that the standard applies whether the refusal is pre- or post-lockout. Id.
Here, the Board found the lockout unlawful because KLB failed to provide the Competitive Information and additional calculations in support of its projected wage cost savings. The Board conducted no analysis either of the purpose of the lockout or of the material effect — if any— of KLB’s failure to disclose on the progress of negotiations. Instead, the Board found the lockout was “tainted” because the issue of wages was “critical to the bargaining” and .the information KLB failed to turn over was related to the proposed wage cuts and the reasons therefor. DA 425-26. But the Board failed to address the fact that the parties were nearly at impasse before the Union’s information request or the fact that negotiations continued after KLB declined the information request. Nor does the Board conclude that disclosure would have made a material difference to the progress of negotiations.
The Board’s finding that the lockout was unlawful is particularly problematic because, given the fact that KLB had no duty to disclose the Competitive Information, the only relevant information that KLB failed to provide were calculations supporting KLB’s wage cost savings information. The record, however, does not support the notion that the failure to provide the calculations materially affected the progress of bargaining or manifested that KLB was attempting to evade its bargaining duty. Accordingly, I find KLB’s lockout lawful. Additionally, because it is undisputed that KLB could lawfully hire temporary replacements if the lockout was lawful, I find its decision to do so lawful as well.[9]
*569 For the foregoing reasons, I respectfully dissent. I would grant KLB’s petition for review in large part, concluding that KLB lawfully declined to provide the Competitive Information (with the exception of the supporting wage cost savings calculations), lawfully locked out employees and hired temporary replacements and lawfully discontinued health insurance for its loekedout employees. I would deny the Board’s cross application for enforcement except as otherwise hereinabove noted. See supra pp. 562 n.4, 567 n.7, 568.

. All dates are in 2007 unless otherwise noted.

. The 16-member bargaining unit was composed of "[a]ll hourly-paid production and maintenance employees in [KLB’s] Bellefontaine, Ohio, plant but excluding all office and clerical employees, guards, professional employees and all supervisors.” KLB Indus., 357 NLRB No. 8, at *13 n. 2.

. The unfair labor practices involved "bargaining violations, an unlawful lockout, ... a unilateral change in terms and conditions related to the cessation of health benefits after the lockout commenced ... [and] an allegation that the employer 'restrained and coerced’ employees in the exercise of their Section 7 rights.” KLB Indus., Inc., 357 NLRB No. 8, at *60.

. The ALJ found, and KLB did not contest, the unfair labor practice resulting from its summoning the police to retaliate for the Union’s picketing.

. KLB’s post-bargaining testimony at the hearing before the ALJ does not bear on the relevance determination; relevance must be demonstrated by the Union at the time it makes its request. N.Y. & Presbyterian Hosp., 649 F.3d at 731.

. The majority also claims the ALJ found that KLB’s "reasons offered at the hearing mirrored those given at the bargaining table.” Maj. Op. 558. I do not read the ALJ to have made that finding; rather, the ALJ did not distinguish between KLB's reasons given at the hearing and those given during negotiations. See KLB Indus., Inc., 357 NLRB No. 8, at *50 (after stating KLB explained its competitive disadvantage claim "in a variety of ways,” ALJ referred to explanations given only "[a]t the hearing”).

. I note that KLB's hesitation in turning over Items 1, 4 and 5 of the Competitive Information was undoubtedly reasonable. The Union requested KLB’s current customer list "so that the Union may contact the customers to determine if any of them is contemplating purchasing products from other sources,” KLB’s former customer list because it "intends on contacting the former customers to learn the reasons why they stopped purchasing” and KLB's "complete list of prices for [its aluminum extrusion] products so that the [U]nion can compare the prices of competitors.” DA 357-58. Even were the Union simply to approach KLB's current and former customers about their purchasing practices, that could well disrupt KLB’s business relationship, including goodwill, with them. Nor would customers be likely to appreciate KLB’s decision to divulge their contact information as a bargaining chip. KLB simply exercised good business sense in insisting on knowing the relevance of the requests before revealing sensitive information.

. I do agree with my colleagues, however, that KLB failed to provide the Union with an adequate cost savings report for its wage plan. See infra p. 568.

. Because I believe the lockout was lawful, I would also reach the issue of the cancelled health insurance. The Board found that KLB's cancellation of its group health insurance plan was unlawful because it was a unilateral change in the terms and conditions of employment. TruServ Corp. v. NLRB, 254 F.3d 1105, 1113 (D.C.Cir.2001) (“An employer violates th[e] duty to bargain if, absent a final agreement or a bargaining impasse, he unilaterally imposes changes in the terms and conditions of employment.1').
The relevant CBA provision states that health insurance benefits may be terminated "no later than the end of the month following the month in which an employee is laid off or is off work for any reason other than circumstances which expressly give rise to insurance benefits hereunder.'' DA 462 (emphasis added). In other words, health insurance benefits last no later than “the end of the month following the month” after an employee is “off work for any reason” (e.g., locked out). Without explanation, the Board found that this language guaranteed KLB employees coverage until "the end of the month following the month” after being locked out. But the CBA provides "no later than," not “no earlier than.” The Board failed to point to any other CBA provision to the contrary. See also Sherwin-Williams Co., 269 NLRB 678, 678 (1984) (employer lawfully declined to pay health insurance premiums for striking employees under CBA provision that required employer to pay monthly health insurance premiums only for employees "in active service”).
Nor do COBRA rights change the analysis. While KLB's decision to terminate its plan deprived employees of potential health insurance continuation coverage under COBRA, COBRA provides that continuation coverage is not required for a plan that normally em *569 ploys "fewer than 20 employees on a typical business day.” 29 U.S.C. § 1161(b). KLB’s health plan covered only sixteen employees.