**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| INTERNATIONAL ALLIANCE OF THEATRICAL STAGE EMPLOYEES, LOCAL 15,<br><br>*Petitioner*,<br><br>v.<br><br>NATIONAL LABOR RELATIONS BOARD,<br><br>*Respondent.* | No. 19-70651<br><br>NLRB Nos.<br>19-CA-186007<br>19-CA-192068<br><br><br>OPINION |

On Petition for Review of an Order of the
National Labor Relations Board

Argued and Submitted March 4, 2020
Seattle, Washington

Filed April 29, 2020

Before: Sandra S. Ikuta, Ryan D. Nelson,
and Danielle J. Hunsaker, Circuit Judges.

Opinion by Judge Hunsaker

## SUMMARY*

### Labor Law

The panel affirmed the National Labor Relations Board's findings that: (a) the employer, Audio Visual Services Group d/b/a PSAV Presentation Services, effectively retracted its claim of inability to pay the union's wage and benefit proposals, thereby limiting its obligation to produce financial documents to the union; and (b) PSAV's conduct did not constitute bad faith bargaining in violation of the National Labor Relations Act (the "Act").

The International Alliance of Theatrical Stage Employees, Local 15 (the "Union") is the certified collective-bargaining representative for PSAV's employees. At issue in this collective bargaining case was whether PSAV effectively retracted its claim of inability to pay the union's wage and benefits proposals, thereby limiting its obligation to produce financial documents to the union, and whether PSAV failed to bargain in good faith.

The panel held that substantial evidence supported the NLRB's finding that the substance of PSAV's bargaining position was an unwillingness to pay, rather than an inability to pay, the Union's demands. The panel concluded that substantial evidence supported the NLRB's finding that PSAV retracted its inability-to-pay claim, and PSAV's failure to produce documents responsive to the Union's first document request did not violate the Act.

---

* This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel rejected the Union's arguments that PSAV bargained in bad faith. First, the panel held that the fact that PSAV never changed its wage proposal did not itself establish that it acted in bad faith; and on this record, the panel could not conclude that PSAV's position on benefits was evidence of bad faith either by itself or in conjunction with its overall bargaining posture. Second, PSAV's employee discipline proposals did not evidence its bad faith. Third, PSAV's behavior away from the bargaining table did not demonstrate its bad faith. Fourth, PSAV's withholding of documents did not evidence PSAV's overall bad faith. Finally, PSAV's refusal to bargain before May 2016 did not evidence overall bad faith bargaining.

---

## COUNSEL

Dmitri Iglitzin (argued), Laura Ewan, and Kelly Skahan, Barnard Iglitzin & Lavitt LLP, Seattle, Washington, for Petitioner.

Kellie Isbell (argued) and Gregoire Sauter, Attorneys; Usha Dheenan, Supervisory Attorney; David Habenstreit, Acting Deputy Associate General Counsel; Alice B. Stock, Associate General Counsel; Peter B. Robb, General Counsel; National Labor Relations Board, Washington, D.C.; for Respondent.

**OPINION**

HUNSAKER, Circuit Judge:

At issue in this collective bargaining case is whether the employer, Audio Visual Services Group d/b/a PSAV Presentation Services ("PSAV"), effectively retracted its claim of inability to pay the union's wage and benefits proposals, thereby limiting its obligation to produce financial documents to the union, and whether PSAV failed to bargain in good faith. Petitioner International Alliance of Theatrical Stage Employees, Local 15 ("Local 15" or "Union") is the certified collective-bargaining representative for PSAV's employees. The National Labor Relations Board ("NLRB") found that PSAV did retract its inability-to-pay claim and that PSAV's conduct both at and away from the bargaining table did not establish that it acted in bad faith in violation of the National Labor Relations Act ("Act"), 29 U.S.C. §§ 151–169. Rather, the NLRB concluded that Local 15 "did not sufficiently test [PSAV]'s willingness to bargain prior to filing its bad-faith bargaining charge." *Audio Visual Servs. Grp., Inc.*, 367 N.L.R.B. No. 103, 2019 WL 1198973, at \*10 (Mar. 12, 2019). We hold that substantial evidence supports the NLRB's findings, and we affirm.

## I.  BACKGROUND

PSAV provides event technology services to hotels and conference centers nationwide, and it maintains offices in Washington state and Pennsylvania. In December 2015, Local 15 was certified as the exclusive collective-bargaining representative for the riggers and technicians[1] in

---

[1] Riggers work with scaffolding and attached devices while technicians work with the operation, maintenance, and transportation of

Washington who provide audio visual support services for PSAV. PSAV challenged the union's certification and refused to bargain with Local 15 from January 2016 until the NLRB denied PSAV's request for review in May 2016.**[2]** *Audio Visual Servs. Grp., Inc.*, 365 N.L.R.B. No. 84, 2017 WL 2241025, at *3 (May 19, 2017). A few days after its request for review failed, PSAV acknowledged Local 15 as the collective-bargaining representative and promptly responded to Local 15's request to begin negotiations.**[3]** From mid-2016 through early 2017, PSAV and Local 15 engaged in the bargaining process and held multiple in-person bargaining sessions, but they did not reach agreement.

The parties' first in-person bargaining session was in June 2016, and the parties primarily focused on establishing ground rules for their bargaining process. The following month, Local 15 presented its first contract proposal, which sought wages of $33 to $45 per hour, representing a 73- to

---

equipment. This case concerns the bargaining process related to the technicians only.

**[2]** Because the NLRB's certification decision was not a "final order," 29 U.S.C. § 160(f), PSAV could obtain review of the decision "only by refusing to bargain, thereby causing the Board to rule that the employer [has] committed an unfair labor pr[actice]." *NLRB v. S.R.D.C., Inc.*, 45 F.3d 328, 330 n.2 (9th Cir. 1995) (internal quotation marks and citation omitted); *accord Boire v. Greyhound Corp.*, 376 U.S. 473, 477 (1964).

**[3]** Local 15 filed a charge with the NLRB against PSAV in January 2016 asserting that PSAV violated the Act by refusing to negotiate while its challenge to Local 15's certification was pending. *Audio Visual Servs. Grp., Inc.*, 2017 WL 2241025, at *1. The NLRB agreed and held that PSAV's refusal to negotiate until May 2017 was an unfair labor practice in violation of the Act. *Id.* at *3. The NLRB's decision regarding Local 15's January 2016 charge is not at issue in this appeal.

120-percent increase depending on job classification. Local 15 also sought, among other things, overtime pay in circumstances where it is not legally required, contributions to Local 15's pension and health plans, limits on PSAV's ability to subcontract work, progressive discipline measures and "just cause" limits on termination and discipline, and an arbitration provision. A few weeks later, PSAV presented a counter-proposal to pay wage rates from $15 to $30 per hour depending on job classification. PSAV also proposed, among other things, that current employees would "maintain their current rate of pay and not be subject to a reduction in pay as a result of this Agreement," overtime would be paid as required by law, the same benefits provided to unrepresented employees would be provided to the employees represented by Local 15, discipline would be based on a "reasonable belief" standard, and arbitration proceedings would be final.

The parties held their second bargaining session a week later, on August 17–18, 2016.[4] Local 15 relayed the employees' disappointment with PSAV's wage proposal. PSAV's attorney, David Shankman, responded that Local 15 was "delusional" and misleading employees and that agreeing to the Union's proposed wage increase would be "suicide" for PSAV and put it "underwater." *Audio Visual Servs. Grp., Inc.,* 2019 WL 1198973, at *2. Shankman asserted that PSAV pays 50-percent commissions to Seattle-area hotels and convention centers, its contracts with those properties are nonexclusive and precarious, and the Seattle market would not support event rates necessary to cover the union's proposed wage rates. Local 15 explained that its

---

[4] We refer to the two-day meeting in August as a single bargaining session while the Administrative Law Judge ("ALJ") referred to the August sessions as two separate sessions.

wage proposal was partially based on PSAV's union contracts in California markets, but PSAV disputed the relevance of those contracts because they relate to "as-needed" employees who have "no expectation of regular hours" unlike PSAV's in-house Washington technicians who "work regardless of specific shows or events and often work when no billable opportunity is presented." During this second bargaining session, Local 15 reduced its requested wage rates by $2 per hour (still a 64- to 106-percent increase) and adjusted its overtime and discipline proposals. The parties did not reach agreement on these issues but reached tentative agreements on other contract terms.

After the second bargaining session, Local 15 requested financial information supporting PSAV's assertion that the Union's wage proposal would put PSAV "underwater" and would be "suicide" for the company. Specifically, Local 15 requested:

> [1] Documents sufficient to substantiate PSAV's claim of its inability to pay the requested wages; particularly, we request that the company provide documents that demonstrate the company's gross revenues, expenses, and profits for 2015 and 2016 to date;
>
> [2] PSAV's current contracts with any and all of its hotel clients in Seattle, SeaTac, Bellevue, Tukwila, and Tacoma;
>
> [3] If the contracts requested in above don't expressly establish the commission rates and sums PSAV has paid to such property owners between January 1, 2015 and the

present, documents that demonstrate that
information;

and,

[4] Documents sufficient to show the rates
charged to all event clients to whom
PSAV has provided service in the cities
listed above within the past year
(September 1, 2015 to present).

*Id.* at \*3. Shankman rebuffed these requests, stating "[t]his
is not an inability to pay for lack of revenue. It's a refusal to
pay an hourly rate that would be detrimental to the business."
He further explained that "no employer in this business
would pay such a wage to its hourly workforce that was so
grossly outside of its business model and if it did so, it would
be suicide for the company." Local 15 did not respond to
PSAV's clarification that it was *unwilling*, rather than
*unable*, to pay the Union's requested wages.

In mid-September, the parties exchanged additional
counterproposals in anticipation of their third in-person
bargaining session on September 19, 2016, but neither party
changed their position on wages, benefits, or discipline.
During their third bargaining session the parties reached
tentative agreements on several terms but not on any of their
key points of disagreement.

Less than one month later, in early October 2016, Local
15 filed an NLRB charge against PSAV, asserting: "Within
the past six (6) months [PSAV] has violated the [the Act] by
failing and refusing to provide information to IATSE Local
15 that is relevant to its role and duties as employees'
collective bargaining representative." Two days later,
Shankman sent a letter to Local 15 and the entire bargaining

unit defending PSAV's wage proposal and explaining that the Union's wage proposal was based on contracts from California markets where union employees are hired as-needed with no expectation of regular hours. Shankman's letter stated: "We heard your proposal for a nearly 100% pay increase for some positions. We just don't agree with it, and we don't accept it."

The parties cancelled bargaining sessions planned for November and December but continued to exchange contract proposals. In late January 2017, Local 15 emailed PSAV a partial contract proposal with modified discipline, grievance, and arbitration provisions. Local 15 stated: "We look forward to the parties' return [to] the table and hope that the time away brings a renewed sense of purpose to the parties' talks and an eye towards real progress." The parties held their fourth in-person bargaining session on January 26, 2017, and reached tentative agreements on some additional terms. The next day, however, Local 15 filed another NLRB charge alleging that PSAV was bargaining in bad faith. After filing this charge, Local 15 cancelled the parties' bargaining session scheduled in March 2017 and declined PSAV's requests to continue negotiations.

After Local 15 filed its second NLRB charge, PSAV's CEO, Mike McIlwain, attended a meeting of the company's Philadelphia employees the day before the employees were scheduled to vote on unionization and stated that negotiations in Seattle were at a stalemate and the same impasse could happen in Philadelphia. A slide from McIlwain's presentation also asserted: "Collective bargaining does not always result in agreement . . . . PSAV will not enter into an agreement that would negatively impact our business model." He also stated that, while PSAV

had to bargain in good faith, it was not obligated to agree on any specific terms.

The NLRB General Counsel issued a complaint against PSAV in May 2017 based on Local 15's October 2016 and January 2017 charges. After briefing and a two-day hearing, the ALJ determined that PSAV violated Sections 8(a)(5) and (1) of the Act by not giving Local 15 the financial information it requested and by not bargaining in good faith during the parties' negotiations. PSAV appealed to the NLRB.

The NLRB agreed in part with the ALJ regarding the document requests, concluding that PSAV violated the Act by refusing to produce the information responsive to Local 15's second, third, and fourth requests because this information was relevant to Local 15's ability to bargain over wages. However, the NLRB concluded that Local 15's first document request related to PSAV's inability-to-pay claim, which PSAV had retracted and, therefore, it did not have to provide this information. Further, the NLRB held that PSAV did not act in bad faith by withholding documents responsive to requests two through four because PSAV reasonably believed that disclosure was not required after it retracted its inability-to-pay claim. The NLRB reversed the ALJ's finding that PSAV failed to bargain in good faith, the subject of Local 15's January 2017 charge, stating: "After considering the totality of [PSAV]'s conduct, both at and away from the bargaining table, we find that the General Counsel did not establish that [PSAV] failed to bargain in good faith in violation of Section 8(a)(5) and (1)." *Audio Visual Servs. Grp., Inc.*, 2019 WL 1198973, at *12. Local 15 now appeals and asks us to overturn the NLRB's decision.

## II.  DISCUSSION

Local 15 asserts the NLRB made two errors. First, it argues that PSAV did not effectively retract its inability-to-pay claim and, therefore, was obligated to produce all documents requested by the Union, including the documents responsive to its first request.[5] Second, it argues that PSAV's conduct at and away from the bargaining table establishes that PSAV failed to bargain in good faith. We have jurisdiction under 29 U.S.C. § 160(f) and address each argument in turn.

### A.  Standard of Review

We must affirm the NLRB if its findings of fact are supported by substantial evidence and it correctly applied the law. *NLRB v. Int'l Ass'n. of Bridge Iron Workers, Local 229*, 941 F.3d 902, 904 (9th Cir. 2019). Evidence is substantial when a "'reasonable mind might accept [it] as adequate to support a conclusion'—even if it is possible to draw a contrary conclusion from the evidence." *Recon Refractory & Constr. Inc. v. NLRB*, 424 F.3d 980, 986 (9th Cir. 2005) (alteration in original) (quoting *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001)). Thus, we must "evaluate the entire record" and uphold the NLRB if a reasonable jury could have reached the same conclusion, even if we "would justifiably have made a different choice" under de novo review. *Local Joint Exec. Bd. of Las Vegas v. NLRB*, 515 F.3d 942, 945 (9th Cir. 2008) (internal quotation marks and citation omitted).

---

[5] PSAV did not appeal the NLRB's decision that PSAV was obligated to produce information responsive to Local 15's second, third, and fourth document requests and, therefore, the NLRB's decision on those requests stands and we do not address them.

**B. Did PSAV effectively retract its inability-to-pay claim?**

Local 15 claims the NLRB erred by finding that PSAV retracted its inability-to-pay claim. According to Local 15, because PSAV maintained the same bargaining posture after its purported retraction, the retraction was ineffective.

The duty to bargain in good faith requires the employer to "provide the union with information that is relevant and necessary to bargaining." *Frankl ex rel. NLRB v. HTH Corp.*, 693 F.3d 1051, 1064 (9th Cir. 2012). Whether an employer's refusal to provide requested financial documents violates the duty to bargain in good faith "turns upon the particular facts of a case." *Id.*; *see also NLRB v. Truitt Mfg. Co.*, 351 U.S. 149, 152–53 (1956). When an employer justifies its bargaining position by claiming an inability to pay the union's demands, the union may "request financial documents sufficient to substantiate the employer's position." *Frankl*, 693 F.3d at 1064. As the Supreme Court explained, "[i]f such an argument is important enough to present in the give and take of bargaining, it is important enough to require some sort of proof of its accuracy." *Truitt*, 351 U.S. at 152–53.

However, asserting an *unwillingness* to pay a union's demands during negotiations is different than asserting a financial *inability* to pay. *See Int'l Chem. Workers Union Council v. NLRB*, 467 F.3d 742, 749 n.4 (9th Cir. 2006) (discussing cases); *Nielsen Lithographing Co.*, 305 N.L.R.B. 697, 699–701 (1999) (same). An employer asserting only an unwillingness to pay does not have a duty to produce information about its financial viability upon request from the union. *Nielsen Lithographing Co.*, 305 N.L.R.B. at 700–01; *SDBC Holdings, Inc. v. NLRB*, 711 F.3d 281, 288 (2d Cir. 2013) ("[N]o . . . need for financial information exists

where an employer has professed only an unwillingness to meet the union's demands, as opposed to, expressly or by implication, claiming it cannot do so during the term of the very contract being negotiated."); *Lakeland Bus Lines, Inc. v. NLRB*, 347 F.3d 955, 961 (D.C. Cir. 2003) ("[D]ecisions, both from the Board and this court, have emphasized a distinction between asserting an inability to pay, which triggers the duty to disclose, and asserting a mere unwillingness to pay, which does not."); *Rivera-Vega v. ConAgra, Inc.*, 70 F.3d 153, 159 (1st Cir. 1995) ("Circuit courts interpreting *Truitt* have long distinguished between cases in which an employer claims an inability to pay . . . and those in which the employer maintains that complying with the union's request would place it at a competitive disadvantage, ordering disclosure in the former but denying it in the latter.").

We determine whether an employer asserted an inability-to-pay claim not based on the use of magic words but on whether the "essential core of the [employer's] bargaining posture as a whole, as expressed to the Union, was grounded in assertions amounting to a claim that it could not economically afford to pay for the Union's proposals." *Int'l Chem. Workers Union Council*, 467 F.3d at 749 (internal quotation marks and citation omitted). After an employer makes an inability-to-pay claim, it "can shed its obligation to furnish financial information if it truthfully and properly communicates a disavowal of its previous assertions of inability to pay." *Id.* at 752. A retraction is effective if the employer makes it "unmistakably clear to a union that it has abandoned its plea of poverty." *Id.* (internal quotation marks and citation omitted). Again, we look to "'the *substance* of the employer's bargaining position'" to determine whether it retracted its claim. *Id.* (emphasis in original) (quoting *Rivera-Vega*, 70 F.3d at 159).

Here, PSAV concedes Shankman's statements at the August 2016 bargaining session that accepting Local 15's proposed wage increases would be "suicide" for PSAV and would put it "underwater" constituted an inability-to-pay claim. Therefore, we express no opinion on that issue and focus on Local 15's argument that the NLRB erred by concluding that PSAV retracted this claim. Following Shankman's August statements, Local 15 issued four document requests to "better understand PSAV's financial position." In declining these requests, Shankman stated:

> What I was explaining during our negotiations is that no employer in this business would pay such a wage to its hourly workforce that was so grossly outside of its business model and if it did so, it would be suicide for the company. This is not an inability to pay for lack of revenue. It's a refusal to pay an hourly rate that would be detrimental to the business.

This is a clear disavowal of a claim of poverty. *See Lakeland Bus Lines*, 347 F.3d at 963. PSAV expressly communicated to Local 15 that its refusal to pay the requested wage rates stemmed from a judgment regarding appropriate business strategy, not from financial nonviability, and no evidence suggests that PSAV's clarification of its position was disingenuous.

The record here does not reveal the type of circumstances present in *International Chemical*—such as making repeated references to economic hardship or threatening an economic layoff—to suggest that PSAV was playing semantic games and "continue[d] to represent its position as one of an ability to pay." 467 F.3d at 754. Quite

the contrary. Shankman sent a letter to the entire bargaining unit a few weeks after his initial retraction and explained: "We heard your proposal for a nearly 100% pay increase for some positions. We just don't agree with it, and we don't accept it." He further explained that Local 15's reliance on California contracts in crafting its wage proposal was flawed because employees in the California markets "are hired on an as-needed basis and have no expectation of regular hours" unlike the employees in Seattle who "work regardless of specific shows or events and often work when no billable opportunity is presented."

While PSAV expressly declined to deviate from its business model presumably due to financial considerations, substantial evidence supports the finding that "'the *substance* of [PSAV]'s bargaining position'" was an unwillingness to pay the Union's demands, not an inability to pay. *Id.* at 752 (emphasis in original) (quoting *Rivera-Vega*, 70 F.3d at 159). Not every financially-motivated decision by an employer establishes that the employer lacks an ability to pay. *See, e.g.*, *Nielsen Lithographing Co.*, 305 N.L.R.B. at 701 ("Efforts to maximize profits and/or minimize costs or to reallocate expenses among various categories of the production function do not, in and of themselves, constitute a financial inability to pay . . . ."). PSAV did not refer to financial nonviability after retracting its inability-to-pay claim, nor does the larger context of the parties' negotiations suggest that PSAV's position was based on a lack of financial viability. Thus, our decision in *International Chemical* is distinguishable from this case, and we conclude substantial evidence supports the NLRB's finding that PSAV retracted its inability-to-pay claim. As a result, we affirm the NLRB's decision that PSAV's failure to produce documents responsive to Local 15's first document request did not violate the Act.

## C. Did PSAV violate its duty to bargain in good faith?

Local 15 argues the NLRB erred in concluding that PSAV bargained in good faith, and it points to several aspects of PSAV's conduct during the bargaining process that it contends evidence bad faith, including PSAV's (1) wage and benefits proposals, (2) employee discipline proposals, (3) CEO's statements at a union meeting in Philadelphia, (4) refusal to produce the documents that Local 15 requested, and (5) refusal to bargain with Local 15 before May 2016. We address each of Local 15's arguments.

Section 8(a)(5) of the Act establishes that it is an unfair labor practice for an employer to "refuse to bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a)(5). Both Sections 8(a)(5) and 8(d) of the Act "require an employer to bargain 'in good faith with respect to wages, hours, and other terms and conditions of employment.'" *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 198 (1991) (quoting 29 U.S.C. § 158(d)). The duty to bargain in good faith focuses on the bargaining parties' conduct and attitude during negotiations and is satisfied where the parties make a "serious attempt to resolve differences and reach a common ground." *NLRB v. Ins. Agents' Int'l Union*, 361 U.S. 477, 486 (1960) (quoting 29 U.S.C. § 158(d)). But the duty to negotiate in good faith does not "compel either party to agree to a proposal or require the making of a concession." *Id.* at 486–87. Nor is hard bargaining prohibited. *See Seattle-First Nat. Bank v. NLRB*, 638 F.2d 1221, 1227 n.9 (9th Cir. 1981). The bargaining parties must mutually approach the bargaining process "in good faith with a desire to reach agreement, . . . [but] Congress intended that the parties should have wide latitude in their negotiations, unrestricted by any governmental power to regulate the *substantive solution of*

*their differences*." *Ins. Agents' Int'l Union*, 361 U.S. at 488 (emphasis added).

To determine if a party negotiated in good faith, the NLRB examines and draws inferences from the parties' conduct as a whole "both at and away from the bargaining table." *Pub. Serv. Co. of Okla.*, 334 N.L.R.B. 487, 487 (2001). When evaluating whether a specific contract proposal evidences bad faith, the NLRB "focuses on whether, on the basis of objective factors, a demand is clearly designed to frustrate agreement on a collective-bargaining agreement." *Liquor Indus. Bargaining Grp.*, 333 N.L.R.B. 1219, 1220 (2001). "[U]nrealistically harsh or extreme proposals can serve as evidence that the party offering them lacks a serious intent to adjust differences and reach an acceptable common ground." *Id.* For example, the NLRB has held an inference of bad faith can be drawn where an employer's contract proposals "taken as a whole, would leave the union and the employees . . . with substantially fewer rights and less protection than provided by law without a contract." *Pub. Serv. Co. of Okla.*, 334 N.L.R.B. at 487–88. But always, our analysis of the parties' bargaining must bear on their attitude toward, and conduct during, the bargaining process itself rather than pass judgment on the substance of their contract positions separate from what they reveal about the bargaining process. *Ins. Agents' Int'l Union*, 361 U.S. at 488–89; *Pub. Serv. Co. of Okla.*, 334 N.L.R.B. at 487–88.

### 1.  Wages and benefits proposals

Determining wages is of utmost importance in the bargaining process. *Liquor Indus. Bargaining Grp.*, 333 N.L.R.B. at 1221. An employer's demand for unilateral control over wages while refusing to provide any governing standard or guidance for how compensation will be set can

indicate bad faith. *See id.* at 1220–21; *Marina Assocs.*, 296 N.L.R.B. 1116, 1130–33 (1989). In *Liquor Industry Bargaining Group*, the employer's final proposal eliminated the employees' ability to contest the amount of wages or how the employer set wages. 333 N.L.R.B. at 1219–21. The proposal also allowed the employer to redirect sales away from union sales representatives, which would effectively reduce their wages. *Id.* Despite repeated requests from the union for information about how the employer intended to set compensation, the employer "stubbornly refused to offer any details, saying only that it needed 'flexibility' in it[s] operations." *Id.* at 1221. The NLRB held that the employer's "offer was extreme in nature . . . and evidence[d] that the [employer] was not negotiating in good faith with a view to [sic] trying to reach or complete agreement with the Union." *Id.*

Likewise, in *Marina Associates*, the employer's proposal gave the union "no role in determining wages." 296 N.L.R.B. at 1130. The employer proposed a tiered wage structure with minimums and maximums for each tier and a review process for wage increases, but it refused to specify the minimum or maximum rates—despite repeated requests from the union—or to define any guidelines for when increases would be granted because that was "left to the sole discretion of the [employer]." *Id.* Additionally, wage decisions were exempted from the employer's grievance and arbitration process. *Id.* Under these circumstances, the NLRB held the employer's wage proposal evidenced its bad faith because it sought to "retain unilateral control over all aspects of wages and thus effectively removed wages as a negotiable issue not only at the bargaining table but also for the term of any bargaining agreement." *Id.* at 1133.

Here, we agree with the NLRB that PSAV's wage proposal is distinguishable from those the employers presented in *Liquor Industry Bargaining Group* and *Marina Associates*. PSAV specified a starting pay range for new employees with an opportunity for merit increases and guaranteed that existing employees would not have their wages reduced under the newly proposed wage structure. PSAV also explained that it would set a new employee's compensation based on the "employee's qualifications and skills" and that it would set merit increases "based on employee performance as determined by the employee's yearly performance appraisal." PSAV also provided its performance-appraisal scale and the corresponding raise percentages. Thus, unlike in *Liquor Industry Bargaining Group* and *Marina Associates*, PSAV did not hide the ball regarding how it would set employee compensation or what rates it would pay.

It is undisputed that PSAV's wage proposals remained unchanged throughout the bargaining process. But Local 15 also took a rigid stance on wages, consistently demanding substantial increases. Even though Local 15 lowered its initial rate proposal by $2 per hour, as the NLRB noted, this reduced rate still constituted a 64- to 106-percent increase from the status quo.

Local 15 based its proposed significant wage increases for the employees in Washington in part on PSAV's California union contracts, but PSAV explained that the employees in the two markets work under materially different circumstances regarding the consistency of work they receive. *See Apogee Retail, NY, LLC*, 363 N.L.R.B. No. 122, 2016 WL 683211, at *1 n.3 (Feb. 17, 2016) (explaining that good faith bargaining requires parties to justify or explain their positions). That PSAV never changed its wage

proposal does not itself establish that it acted in bad faith. *See St. George Warehouse*, 349 N.L.R.B. 870, 872 (2007) ("[A] party is entitled to stand firm on a position if he reasonably believes that it is fair and proper or that he has sufficient bargaining strength to force the other party to agree."). PSAV's explanation for rejecting the Union's wage proposal is not facially unreasonable or disingenuous. And in the context of the parties' negotiations, PSAV's wage proposal is not the kind of "unrealistically harsh or extreme proposal[]" that itself evidences bad faith. *Liquor Indus. Bargaining Grp.*, 333 N.L.R.B. at 1220. Moreover, as the NLRB found, PSAV's bargaining conduct does not indicate that it took an all-or-nothing stance on wages and refused to negotiate this issue with Local 15. Instead, the negotiations thus far demonstrate that the parties have divergent views on the appropriate business model and wage rates for the Washington market, which is not something we or the NLRB have the authority to regulate. *See Ins. Agents' Int'l Union*, 361 U.S. at 488; 29 U.S.C. § 158(d).

Local 15 also claims that PSAV demanded exclusive control over employee benefits. Specifically, Local 15 contends it was bad faith for PSAV to insist on aligning bargaining unit employees' benefits with the benefits provided to non-unit employees. PSAV's proposal lacks the hallmarks of exerting total control over employee benefits. *Cf. Pub. Serv. Co. of Okla.*, 334 N.L.R.B. at 488 (employer's final proposal denied the union any role in establishing or maintaining employee benefits by, among other things, permitting the employer to "chang[e] from time to time for business reasons important employee benefits such as vacation days, holidays, medical insurance, leave time, and life, disability, and on-the-job accident insurance") (internal quotation marks omitted). PSAV specified the accrual rates for vacation time and paid sick and safe time. For all other

benefits (retirement savings, disability plan, life insurance, etc.), PSAV proposed that unit employees would be granted the same benefits offered to non-unit employees. PSAV's counterproposal differed from Local 15's benefit proposal, but there is no indication that Local 15 materially challenged PSAV's position in subsequent bargaining sessions or communications. Instead, Local 15 claims that PSAV refused to bargain over benefits in the August 2016 session where Shankman claimed the wage proposals would be suicide for PSAV. On this record, we cannot conclude that PSAV's position on benefits is evidence of bad faith either by itself or in conjunction with its overall bargaining posture.

For these reasons, we find that substantial evidence supports the NLRB's conclusion that PSAV's wages and benefits proposals did not indicate bad faith; instead, both parties were "engaged in hard bargaining." *Audio Visual Servs. Grp., Inc.*, 2019 WL 1198973, at *8.

### 2. Employee discipline proposals

Local 15 also claims that PSAV's employee discipline proposals evidence its bad faith. As the NLRB found, PSAV's proposed discipline standard did not maintain the status quo. Coming into the bargaining process, the employees represented by Local 15 were at-will. At-will employment gives the employer unfettered discretion: "an employee may be terminated for a good reason, bad reason, or no reason at all." *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 606 (2008) (internal quotation marks and citation omitted). As the NLRB correctly found, PSAV proposing a reasonable-belief standard demonstrates that it was "willing to limit its discretion over discipline and discharge." *Audio Visual Servs. Grp., Inc.*, 2019 WL 1198973, at *9 n.15. Contrary to Local 15's assertion, PSAV's employee discipline proposal is not an example of an employer leaving

the "Union and the employees with substantially fewer rights and protection than they would have had without any contract at all." *Pub. Serv. Co. of Okla.*, 334 N.L.R.B. at 489. Nor does this proposal show PSAV was trying to "frustrate agreement on a collective-bargaining contract." *Liquor Indus. Bargaining Grp.*, 333 N.L.R.B. at 1220.

### 3.  CEO McIlwain's statements

Local 15 also asserts that PSAV's behavior away from the bargaining table demonstrates its bad faith. Specifically, Local 15 points to a meeting held the day before PSAV's Philadelphia employees were scheduled to vote on unionization during which McIlwain stated that negotiations in Washington were at a "stalemate," which could occur in Philadelphia, and that PSAV "will not enter into an agreement that would negatively impact our business model."

Generally, the NLRB is "reluctant to find bad-faith bargaining exclusively on the basis of a party's misconduct away from the bargaining table." *St. George Warehouse, Inc.,* 349 N.L.R.B. at 877 (internal quotation marks and citation omitted). We consider such conduct only "for what light it sheds on conduct at the bargaining table." *Id.* (internal quotation marks omitted). For example, in *St. George Warehouse*, the NLRB held that unlawfully assisting with a petition to decertify the union and unilaterally changing the employees' health plan were insufficient to demonstrate the employer bargained in bad faith. *Id.* Significant to the NLRB were that two individuals who helped with the decertification petition did not represent the employer during negotiations, and the third individual who was involved in both the decertification and negotiations had only one conversation about decertification. *Id.* This person's involvement with the petition did not cause negotiations to

break down because negotiations continued for another year. *Id.* Likewise, the employer changed the employees' health plan because the prior plan expired, and it was unclear whether the new plan was a "material and substantial change to the status quo." *Id.*

Conversely, in *Overnite Transportation Company*, 296 N.L.R.B. 669, 670–71 (1989), the NLRB held that statements threatening employees with plant closures and job loss if the employees unionized, coupled with the employer's threats to bargain in bad faith, refuse to sign a contract with the union, and break a strike showed that the employer was "bent on behaving as its managers had earlier threatened." *See also Koons Ford of Annapolis*, 282 N.L.R.B. 506, 521 (1986) (threats of forcing a strike, severe discipline, and loss of preexisting employee privileges such as a parts discount and ability to work on personal vehicles after hours violated section 8(a)(1) of the Act); *Kona 60 Minute Photo*, 277 N.L.R.B. 867, 868 (1985) (holding that employer's threatening and interrogating employee in connection with union organizing constituted an unfair labor practice).

Here, McIlwain did not threaten unlawful conduct. He described the status of negotiations in Washington and stated the truism that the duty to bargain in good faith does not require PSAV to accept specific proposals. *See Ins. Agents' Int'l Union*, 361 U.S. at 486. And even if his comments were intended to dissuade PSAV's Philadelphia employees from supporting the union, they do not demonstrate that PSAV acted in bad faith in its Washington negotiations. As in *St. George Warehouse*, there is no evidence that McIlwain's speech caused the parties' negotiations to break down where the speech occurred after Local 15 filed a charge alleging that PSAV was negotiating in bad faith and refused to

continue negotiations with PSAV. Nor were McIlwain's statements akin to the threats of plant closures and job losses in *Overnite*. Thus, we conclude that substantial evidence supports the NLRB's conclusion that PSAV's conduct away from the bargaining table does not indicate bad faith bargaining.

### 4.  Refusal to provide requested documents

In addition to arguing that PSAV's withholding of documents was itself a violation of the Act, Local 15 also argues the withholding evidences PSAV's overall bad faith. As previously discussed, the duty to bargain in good faith generally requires employers to provide "relevant information needed by a labor union for the proper performance of its duties as the employees' bargaining representative." *Detroit Edison Co. v. NLRB*, 440 U.S. 301, 303 (1979). However, not every refusal to produce documents, even relevant documents, violates the Act. *NLRB v. Associated Gen. Contractors of Cal., Inc.*, 633 F.2d 766, 770 (9th Cir. 1980). "The employer's reasons for nondisclosure and the negotiating conduct of the parties must be considered." *Id.*; *see also Detroit Edison Co.*, 440 U.S. at 318 (rejecting "proposition that union's interests in arguably relevant information must always predominate over all other interests, however, legitimate" and noting "such an absolute rule has never been established"); *Frankl*, 693 F.3d at 1064 (recognizing circumstances where an employer can limit its disclosure in response to union's requests for records).

We previously concluded that PSAV was not required to produce documents responsive to Local 15's first document request because it retracted its inability-to-pay claim. Therefore, PSAV's failure to produce those documents was not an act of bad faith. Likewise, we conclude that PSAV's

failure to produce documents responsive to Local 15's other requests does not indicate bad faith bargaining. PSAV believed, although mistakenly, that the relevance of all of Local 15's document requests depended on PSAV making an inability-to-pay claim and, therefore, it had no duty to provide the requested information because it was not making such a claim. PSAV also explained it was unwilling to produce documents responsive to Local 15's requests because they sought "proprietary and confidential business information."

This is not a case where PSAV ignored or refused even to consider Local 15's requests. Nor is it a case where the information sought by Local 15 was presumptively relevant to the bargaining process. *See Associated Gen. Contractors of Cal.*, 633 F.2d at 770 n.4a. PSAV explained to Local 15 why it was not producing documents responsive to the document requests. And even though the NLRB later determined that PSAV's position was partially wrong, the error was not so patently obvious as to suggest that PSAV's position was illegitimate or that it was trying to frustrate the parties' ability to reach an agreement. Further, there is no indication that Local 15 challenged PSAV's explanation or made any effort to negotiate this issue with PSAV or persuade PSAV that the requested documents remained relevant to the bargaining process regardless of any inability-to-pay claim. *See id.* at 770 (holding "the negotiating conduct of the parties" is relevant in assessing good faith related to document production); *cf. Frankl*, 693 F.3d at 1064–65 (holding that employer withheld requested documents in bad faith where union repeatedly explained why limited production was inadequate and where union signed confidentiality agreement to address employer's concerns). Instead, less than a month after issuing its document requests, Local 15 filed a charge against PSAV

with the NLRB. Under these facts, we conclude that PSAV's failure to produce documents responsive to Local 15's requests is not evidence of bad faith bargaining.

### 5. Refusal to bargain before May 2016

Finally, Local 15 contends that PSAV acted in bad faith by refusing to bargain with Local 15 from January to May 2016. As noted above, *see supra* note 2, PSAV refused to bargain during this time in order to obtain review of the NLRB's certification decision, *see S.R.D.C., Inc.*, 45 F.3d at 330 n.2, and the NLRB found that PSAV's refusal was unlawful, *Audio Visual Servs. Grp., Inc.*, 2017 WL 2241025, at *3. However, in the current proceeding, the NLRB concluded that PSAV's refusal did not evidence overall bad faith bargaining. Specifically, the NLRB noted that PSAV's challenge to Local 15's certification was pending during this time and that after PSAV's challenge was rejected, it quickly engaged in the bargaining process with Local 15. The record does not compel a contrary conclusion. PSAV has actively engaged in the bargaining process since May 2016 by attending multiple in-person bargaining sessions, responding to Local 15's contract proposals, making its own proposals, and reaching agreement with Local 15 on numerous contract terms.

Finally, we note—as did the NLRB—that viewing the parties' entire course of negotiations reveals that Local 15 did not sufficiently utilize the bargaining process before charging PSAV with bad faith. The negotiations occurred from June 2016 through January 2017—eight months. Local 15 filed an NLRB charge related to its document requests in October, less than a month after issuing the requests. PSAV had explained why it was not producing the requested documents, and Local 15 never responded to PSAV's explanation or asserted its continued belief that it was

entitled to the requested documents. Then, after only one additional bargaining session (because both parties cancelled bargaining sessions scheduled for late 2016), Local 15 filed another NLRB charge asserting PSAV was bargaining in bad faith. And since filing that charge, it has refused PSAV's efforts to continue bargaining. On this record, we find no error in the NLRB's conclusion that Local 15 "did not sufficiently test [PSAV]'s willingness to bargain prior to filing its bad-faith bargaining charge." *Audio Visual Servs. Grp., Inc.*, 2019 WL 1198973, at \*10.

## III.  CONCLUSION

PSAV effectively retracted its inability-to-pay claim and, therefore, we affirm the NLRB's decision that PSAV did not violate the Act by failing to produce documents responsive to Local 15's first document request. Substantial evidence also supports the NLRB's conclusion that PSAV's conduct at and away from the bargaining table did not constitute bad faith bargaining.

**AFFIRMED**.